Louis **TERRAZAS**, Ernest Angelo, Jr. and Tom Craddick

v.

Bob **SLAGLE**, Chairman of the Democratic Party of Texas, Dan Morales, Attorney General of the State of Texas, Fred Meyer, Chairman the Republican Party of Texas, John Hannah, Jr., Secretary of State of the State of Texas, Ann W. Richards, Governor of the State of Texas.

Civ. Nos. A–91–CA–425, A–91–CA–426 and A–91–CA–428.

United States District Court, W.D. Texas, Austin Division.

Dec. 24, 1991.

Order and Judgment Jan. 10, 1992.

As Amended Jan. 13, 1992.

See also —— F.R.D. ——.

John N. McCamish, Jr., McCamish, Martin & Loeffler, Jonathan D. Pauerstein, McCamish, Ingram, Martin & Brown, San Antonio, Tex., Wayne H. Prescott, Craig Morgan, Elizabeth Zeck, Brown, Maroney, Rose, Barber & Dye, Austin, Tex., Arthur John Brender, Jr., Brender & Colosi, Ft. Worth, Tex., Tom West, Lovett, West & Lasley, L.L.P., Austin, Tex., Kleber C. Miller, Carl Victor Anderson, Jr., Shannon, Gracey, Ratliff & Miller, Fort Worth, Tex., Gerald Leigh Bracht, Rex D. VanMiddlesworth, Frederick D. Junkin, Mayor, Day, Caldwell & Keeton, L.L.P., Houston, Tex., James Grissom, Harlingen, Tex., Robert E. Luna, Law Offices of Earl Luna, P.C., Earl Luna, Dallas, Tex., Gerald Jones, Steven Rosenbaum, David Marblestone, Gaye L. Hume, Dept. of Justice, Washington, D.C., Cynthia F. Malone, Angela Sandoval Raba, Civ. Section, Judith A. Sanders–Castro, San Antonio, Tex., James C. Harrington, Texas Civil Rights Project, Austin, Tex., Jose Garza, TX Rural Leg. Aid, San Antonio, Tex., E.R. Fleuriet, Fleuriet & Schell, Harlingen, Tex., Dick Terrell Brown, Brown & LaCallade, P.C., Martha Sue Dickie, Roy Q. Minton, Minton, Burton, Foster & Collins, Alan D. Albright, Akin, Gump, Strauss, Hauer & Feld, Robert J. Hearon, Jr., Michael Diehl, Graves, Dougherty, Hearon & Moody, Austin, Tex., Rodney Scott Goble, Goble & Swanton, Waco, Tex., Geoffrey M. Gay, Butler, Porter & Gay, Austin, Tex., Merril E. Nunn, City of Amarillo, Amarillo, Tex., Fernando Rodriguez, Jordan Schulte & Burchette, Steven W. Smith, John M. Harmon, David Herndon, Graves, Dougherty, Hearon & Moody, Austin, Tex., Charles J. Cooper, Michael A. Carvin, James C. Wilson, Shaw, Pittman, Potts & Trowbridge, Washington, D.C., for plaintiffs.

James P. Allison, Allison & Associates, Renea Hicks, Javier Guajardo, Sp. Asst.

Atty. Gen., David R. Richards, Richard Edwin Gray, III, Gray & Becker, P.C., Austin, Tex., for defendants.

Bob Slagle, pro se.

Fred Meyer, pro se.

Before GARWOOD, Circuit Judge, and NOWLIN and SMITH, District Judges.

## SUMMARY OPINION AND JUDGMENT

Before the Court is plaintiffs' motion for implementation of interim plan filed in cause number A–91–CA–425 on November 14, 1991; plaintiffs' request for implementation of interim plan filed in cause number A–91–CA–426 on November 27, 1991; Intervenor Simms and Lucio's request for implementation of interim plan filed in cause number A–91–CA–426 November 27, 1991; Intervenor Sibley's request for interim relief filed in cause number A–91–CA–426 November 27, 1991; and plaintiffs' request for implementation of interim plan and consolidated hearing filed in cause number A–91–CA–428 on November 27, 1991. On December 10, 1991 this Court began a nearly four-day hearing on these various motions at which time the argument of counsel, testimony of witnesses, and other evidence was offered into the record. Upon review of the motions, the responses filed, the file of this case, and the evidence and argument presented at the hearing the Court is of the following opinion.

## I. BACKGROUND

Rarely has the procedural background of a case been more convoluted or important than in the instant causes dealing with redistricting in Texas following the 1990 Decennial Census. On February 7, 1991 various individual Hispanic voters (*Mena* plaintiffs) filed suit in Hidalgo County District Court, 332nd Judicial District of Texas, challenging the figures published in the 1990 Decennial Census on the grounds that said figures grossly underrepresented the number of Mexican–Americans and African–Americans in Texas. This census undercount, the argument continued, could potentially operate to deprive these minority groups of their voting rights under article I, sections 3, 3a, 19 and 29 of the Texas Constitution. A census undercount case was also filed by the *Mena* plaintiffs in the United States District Court for the Southern District of Texas, later amended to include redistricting challenges. No significant action has taken place in the Southern District case, nor was a three-judge panel ever impaneled there. While the state lawsuit was underway, the Legislature reapportioned state senatorial and representative districts using the 1990 census without adjusting for any undercount. The Legislature later reapportioned congressional districts in House Bill 1 ("HB 1") also using unadjusted census figures. All three plans were submitted to the Justice Department for preclearance as required by Sec. 5 of the Voting Rights Act.

Meanwhile, on May 23, 1991 plaintiffs Terrazas, Angelo, and Craddick ("Republican plaintiffs") filed three separate lawsuits invoking this Court's jurisdiction under the Voting Rights Act and Fourteenth and Fifteenth Amendments challenging the reapportionment scheme adopted by the State Legislature for the Texas House of Representatives, Texas Senate, and United States Congress in cause numbers 425, 426, and 428 respectively. A three-judge panel was convened in these cases on June 24, 1991. After the Republican plaintiffs filed their instant lawsuits, the *Mena* plaintiffs amended their state pleadings to challenge the validity of House Bill 150 ("HB 150"), (House), and Senate Bill 31 ("SB 31"), (Senate), to require that legislative districts be redrawn using adjusted population figures. The same various state officials (the "state defendants"), among others, were named as defendants in both state and federal cases. There were now both state and federal lawsuits running parallel attacks on the 1990 redistricting statutes passed by the Texas Legislature. As evidenced by the record in this case, these "parallel" suits would cross, intertwine, and tangle to the point that the next round of primary elections in Texas may not occur as scheduled without action by this Court.

It was the state case that first caused this Court to review the substance of the

Republican plaintiffs' Complaints. On July 29, 1991 the State Defendants filed a motion to stay state court proceedings, requesting this Court stay the Hidalgo County proceedings, arguing that a state court order requiring the State of Texas to use population numbers other than those reported in the 1990 Decennial Census could place the state defendants in the quandary of having to comply with a state court order that could eventually be found in contravention of federal constitutional principles by this Court. In the interest of avoiding such a state and federal constitutional conflict, the argument continued, a stay of state proceedings was warranted. Finding the defendants' posture did not entitle them to injunctive relief, this Court denied the motion by Order entered August 2, 1991. On August 5, 1991, the state court commenced hearing on the *Mena* plaintiffs' application for temporary injunction and partial summary judgment, with the state defendants, represented by the Attorney General, defending the validity of the reapportionment statutes passed by the Legislature.

On August 22, 1991 the state court granted plaintiffs' requested relief, declared the 1990 Decennial Census undercounted minority populations in Texas, and ordered the state to submit new plans using adjusted figures by September 30, 1991. The state promptly filed an appeal with the Texas Supreme Court, requesting a stay of the trial court proceedings pending the appeal. The Supreme Court granted the stay on September 24, 1991.

While the Attorney General had filed an appeal, he was actively working with the *Mena* plaintiffs in an attempt to resolve their differences with respect to the Texas Senate. By October 7, 1991, nineteen of the state's thirty one senators unofficially approved an agreement settling the dispute with the *Mena* plaintiffs regarding the Tex-

as Senate. Because the stay of the *Mena* proceedings remained in effect, plaintiffs filed a new lawsuit in Hidalgo County styled *Quiroz v. Richards*, and entered an agreed judgment in that case memorializing the senate settlement—all on the 7th of October, 1991. Part of that Judgment ordered that elections for the state Senate be held under the alternate districting plan agreed to by the parties in *Quiroz*. As a result, the Texas Secretary of State notified the Department of Justice ("DOJ") that SB 31, even though it had been passed by both houses of the State Legislature, would be withdrawn from consideration for preclearance, and that the *Quiroz* Senate plan would be promptly substituted in its place. SB 31 had been before the DOJ for 59 days when the Secretary of State removed it from consideration.[1] The DOJ granted preclearance approval of the *Quiroz* plan on November 18, 1991. Though they had been defenders of SB 31 throughout the trial proceedings, as far as the State Defendants were concerned the *Quiroz* plan was now the law under which elections would take place for the Texas Senate.

As the procedural shenanigans continued to unfold in the state proceedings, this Court issued various scheduling orders commanding the parties in the instant causes to submit briefs and proposed interim plans for review in the event preclearance would not be obtained in time for the 1992 primary elections to proceed. On October 9, 1991 the Republican plaintiffs requested a temporary restraining order with this Court seeking to enjoin the State from substituting the *Quiroz* plan with the DOJ in place of SB 31, and further enjoin the State Defendants from engaging in similar settlement activities that could result in HB 150 being replaced by another agreed plan.[2] A hearing on this motion was held

---

1. Sec. 1973c requires the DOJ to grant preclearance or issue its objections within 60 days of submission of the proposed voting change.

2. The state parties have since reached a similar agreement with the Texas House plan, and have submitted their alternative plan to the DOJ for review. The DOJ had lodged objections to HB

150 by letter dated November 12, 1991, finding the plan passed by the Legislature diluted minority voting strength in several specific areas of the state. The *Mena* settlement for the Texas House purported to address concerns voiced by the DOJ.

October 23, 1991, and is maintained under advisement to date. The Republican plaintiffs also challenged the *Quiroz* plan in a mandamus action before the Texas Supreme Court. Though Republican plaintiffs had never intervened in either of the state cases, the Texas Supreme Court found they had standing to challenge the activities of the Attorney General and the rulings of the trial judge, and conditionally granted the writ in a plurality opinion delivered December 17, 1991. Finding the Attorney General did not exceed his authority in negotiating the *Quiroz* and *Mena* settlements, the Court did find that it was an abuse of the trial judge's discretion to accept the *Quiroz* plan without any adversary proceeding given the tremendous public impact of such a judgment. The effect of this opinion was to void the *Quiroz* plan, place the *Mena* settlement for the House into question, and return the case to the trial court for a full hearing before entry of judgment.

This panel did not have the benefit of the views of the Texas Supreme Court when the parties in the instant cause came before it for hearing on what interim relief, if any, should be fashioned to ensure the 1992 primary elections proceed as scheduled under plans that pass muster under the Voting rights Act and the U.S. Constitution. As it stands at the time of this Opinion, there are no legal plans reapportioning seats for election to the Texas House or Senate that have been precleared by the DOJ. Only HB 1, the plan passed by the Legislature in special session reapportioning seats to the United States Congress, has received preclearance and not been successfully challenged under state law. On December 20, 1991, the DOJ filed with this Court notice that it reserved formal comment on its views regarding SB 31 or whether the *Mena* settlement addressed its concerns with HB 150 until an unspecified date. Accordingly, this Court has reviewed HB 150, SB 31, and HB 1 in light of the Republican plaintiffs' claims, the concerns of parties *amicus* and Intervenors, the DOJ's objections to HB 150, and the requirements of the Voting Rights Act and

Fourteenth and Fifteenth Amendments to the U.S. Constitution.

## II. FEDERAL STANDARDS FOR RE-DISTRICTING

■ Title 42 United States Code Sections 1973 et seq. were originally enacted by Congress in the Voting Rights Act of 1965. An attempt to increase the protection afforded minority voters under the Fourteenth and Fifteenth Amendments, the Act was further strengthened by amendment of Sec. 1973 ("Sec. 2") in 1982 by establishing a totality of the circumstances effects test for minority vote dilution. This forgiving standard alleviates a plaintiff's burden of proving discriminatory intent as traditionally required to prove a violation of the Fourteenth and Fifteenth Amendments. *See City of Mobile, Alabama v. Bolden,* 446 U.S. 55, 70, 100 S.Ct. 1490, 1501, 64 L.Ed.2d 47 (1980). Section 1973 provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner *which results* in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section. (emphasis added)

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in

numbers equal to their proportion in the population.

42 U.S.C. Sec. 1973 (West Supp.1991).

This standard does not require that minority candidates be elected to public office in numbers equal to their percentage of voting age population. Rather, upon review of the totality of the circumstances, a plan redistricting legislative seats fails to satisfy the requirements of Sec. 2 if it: (1) dilutes the voting strength of a minority group populous and concentrated enough to constitute a voting majority in a single district by frustrating the electoral choices of the minority group due to the bloc voting of other voters in the district; or (2) the number of districts in which minority candidates may be successfully elected are reduced due to disproportionally "packing" that minority group into select districts. *See Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Though *Gingles* dealt with vote dilution in the context of multimember districts, courts in this Circuit have adopted the use of its test in single-member district litigation. *See e.g., Brewer v. Ham,* 876 F.2d 448 (5th Cir. 1989); *Ewing v. Monroe County, Mississippi,* 740 F.Supp. 417 (N.D.Miss.1990). In *Brewer,* the Circuit held the standard in *Gingles* is essentially a threshold a plaintiff must cross before the Court reviews the propriety of a given plan under the totality of the circumstances test. *Brewer,* 876 F.2d at 450. *Gingles* also served to narrow the Court's review of the circumstances to focus on the extent minority groups have been able to elect candidates of their choice, and the extent to which voting is polarized. *Gingles,* 478 U.S. at 48, n. 15, 106 S.Ct. at 2765, n. 15. There is ample evidence in the record, including the concession of counsel for the State that there is a strong history of polarized voting in Texas.

■ Plaintiffs have also alleged all three reapportionment plans passed by the Texas Legislature are replete with partisan gerrymandering in violation of the Equal Protection Clause of the Fourteenth Amendment. Intervenor Sibley makes similar assertions, focusing particularly on one Senate district.

In 1986, the United States Supreme Court in *Davis v. Bandemer,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), held that partisan gerrymandering claims are justiciable, though it offered little hope that political plaintiffs might prevail on such claims. Under *Bandemer,* a plaintiff challenging a plan must show: the plan intentionally discriminates against a political group; the plan will have a long term disproportionate effect on that group's election of representatives; *and* the effect of the redistricting scheme as a whole consistently shuts out that group from the political process in that state. *Id.* at 141–143, 106 S.Ct. at 2814–16. This Court's analysis of the evolving law in this area falls outside the scope of this opinion, and the evidence before it at the present time. The parties may have ample opportunity to make a more complete record during the trial on the merits, which the Court presumes will not take place until after the 1992 elections.

A brief recitation of the responsibilities of the DOJ is also in order at this point. Since 1975, Texas has fallen within the scope of Sec. 5 of the Voting Rights Act which requires that any changes in voting law in a covered state be precleared by the DOJ before they may be implemented. 42 U.S.C. Sec. 1973c (West 1981). A Sec. 5 review is primarily concerned with whether the proposed change causes a retrogression in minority voting strength, though DOJ guidelines currently require the plan to be scrutinized for noncompliance with Sec. 2 before preclearance may be obtained. *See City of Lockhart v. United States,* 460 U.S. 125, 133–134, 103 S.Ct. 998, 1003–04, 74 L.Ed.2d 863 (1983); *Beer v. United States,* 425 U.S. 130, 139–141, 96 S.Ct. 1357, 1362–64, 47 L.Ed.2d 629 (1976); *and* 28 C.F.R. Sec. 51.54(a) (1991); 28 C.F.R. Sec. 51.55(b) (1991). The State also bears the burden of showing that the proposed voting change was not enacted with a discriminatory purpose. 28 C.F.R. Sec. 51.52 (1991).

■ Preclearance of a proposed plan does not bar a subsequent court proceeding brought under Sec. 2. 42 U.S.C. Sec.

834

1973c. Should this Court find that any of the plans fail to satisfy the federal requirements, it is within the ambit of this panel's discretion to draw remedial plans that may not otherwise comply strictly with the requirements for fashioning permanent remedies in order to ensure that elections proceed as scheduled. *See Upham v. Seamon,* 456 U.S. 37, 44, 102 S.Ct. 1518, 1522, 71 L.Ed.2d 725 (1982); *Burns v. Richardson,* 384 U.S. 73, 85–86, 86 S.Ct. 1286, 1293, 16 L.Ed.2d 376 (1966). Any plan drawn by this Court is also exempt from the preclearance requirements of Sec. 5. *Connor v. Johnson,* 402 U.S. 690, 691–692, 91 S.Ct. 1760, 1761–62, 29 L.Ed.2d 268 (1971).

## III. REVIEW OF THE 1990 REAPPORTIONMENT PLANS

### A. *United States Congress*

Republican plaintiffs challenge the following congressional districts drawn in HB 1: Districts 1, 2, 4, 5, 6, 8, 9, 13, 14, 17, 19, 21, 22, 23, 24, 28, 29, and 30. None of these districts generated an objection from the DOJ, and the plan received preclearance on November 18, 1991. Plaintiff's Exhibit 76. With regard to districts 1, 2, 4, 5, and 8, Republican plaintiffs assert that minority communities were split to protect Anglo Democrat incumbents. Upon review of the population data for the counties that comprise these districts, and comparison of the population analysis reports ("PAR Reports") for HB 1 and the Republican proposed plans, this Court finds there are not a sufficient number of minorities in the counties comprising these districts to enable minorities to elect a candidate of their choice, that HB 1 does not regress the number of minorities in the districts as drawn, and that the Republican plan actually has fewer minorities in their proposed districts resulting in an average Anglo voting age percentage of 81.48% compared with an average of 80.36% in HB 1. *See* Plaintiff's Exhibits 77a–g, and Exhibits 85a–g. Similar claims were lodged against districts 13, 17, 19, 21, 23, and 28, though in this instance the Republican plaintiffs argued the districts as drawn in HB 1 were drawn as the result of political gerrymandering. This Court finds the plaintiffs have offered no sufficient evidence in support of their political gerrymandering argument pertaining to these districts, and that they likewise contain an insufficient number of minority residents to support a finding that the districts as drawn dilute minority voting strength.

As for districts 6, 9, 14, 22, 24, and 29, the Republican plaintiffs allege that districts 25 and 8 are regressed at the expense of creating district 29 as a Hispanic district, and that the other districts were drawn to dilute Republican voting strength. Again, the plaintiffs have offered little evidence in support of their political gerrymandering claims. A comparison of the minority voting age populations of districts 25 and 8 also reveals that the number of minorities residing in the counties comprising each district is insufficient to elect a candidate of their choice, and that the number of minorities placed in those districts under HB 1 does not serve to dilute the minority voting strength in adjacent minority majority districts 18 (Black) and 20 (Hispanic). District 20 is a new Hispanic congressional seat in Harris County. The percentage of minority voting age populations for the plaintiffs' proposed versions of the two minority seats in Harris County are within a percentage point of those in HB 1. *See* Court's Exhibit 1; Plaintiff's Exhibits 77a–g, and Exhibits 85a–g.

Plaintiffs' remaining challenges to HB 1 involve a minority district encompassing the Dallas metropolitan area. District 30 in Dallas County is a new minority majority district drawn to elect a Black congressional candidate. While the 61.5% Black and Hispanic voting age population ("VAP") is commendable, the configuration of District 30 closely resembles a microscopic view of a new strain of disease, and has been the subject of well-deserved national ridicule as the most gerrymandered district in the United States. Though this Court is concerned with the flagrant abandonment of compactness and preservation of communities of interest in this district, the Court further finds that a primary motive for any gerrymandering was to enhance Black vot-

ers' ability to elect a candidate of their choice. The mere fact that the Republican plaintiffs have fashioned a more compact District 30 with identical voting age population percentages, though more aesthetically pleasing, does not give rise to a finding of a Sec. 2 violation by this Court at this time. This Court further finds that District 30 as drawn in HB 1 does not dilute the minority vote in adjacent districts, including Hispanics, as has been found in the House and Senate plans passed by the Legislature. For the reasons set forth in this section of the opinion, and the fact HB 1 has received preclearance from the DOJ, this Court finds plaintiffs' claims for preliminary relief fail to meet the standard for injunction to issue at this time, and that the 1992 primary elections for U.S. Congress may be conducted pursuant to HB 1.

### B. *Texas Senate*

As discussed *supra*, there is presently no legally enacted state plan redistricting the Texas Senate that has received preclearance from the DOJ. Accordingly, this Court must scrutinize SB 31 for Sec. 2 and constitutional deficiencies as alleged in plaintiffs' complaint without the benefit of the DOJ's comments, if any, compiled during its 59 day review of that plan. Most of the issues raised in intervenors' complaints are either rendered moot by the Texas Supreme Court's December 17, 1991 opinion in *Quiroz*, or are not relevant to this Court's review of SB 31 at this time. This Court specifically finds that the *Quiroz* settlement plan is not valid under state law, but merely an alternative proposal submitted to the Court that because of the actions of the Secretary of State happened to receive favorable review by the DOJ.

Plaintiffs challenge the validity of Senate districts 1, 2, 3, 4, 9, 12, 15, 17, 19, 23, 26, and 31. With regard to District 15, this Court is persuaded by plaintiffs' claim that SB 31 does not create a credible Hispanic senate district in Harris County, but actually dilutes minority voting strength by placing 50.8% voting age Hispanics in that district as compared to the district 15 fashioned by this Court with 51.5% Hispanic voters. Plaintiffs argue that minorities which could have been placed in district 15 to make it a stronger minority majority district were splintered into district 11 to protect an Anglo incumbent. This Court's interim plan also increased the Black VAP in District 15 from 14.9% to 15.9%, boosting the combined Black and Hispanic VAP in that district by almost 2%. Due to the configuration of Court district 15, the Court's interim plan also increased the Black VAP of District 13 from 50.4 to 57.2%. The combined effect of the Court's interim Districts 15 and 13 significantly increases the voting strength of minorities in Harris County by ensuring that both a Black and Hispanic state senator will probably be elected from Harris County. This probability was not as great under SB 31.

Turning to North Texas and the Dallas-Fort Worth metropolitan area, plaintiffs challenge districts 2, 9, 12, and 23. Under SB 31, District 12 generally outlines the City of Fort Worth and contains 64.9% Anglo VAP, with approximately 18% Black VAP and 15% Hispanic VAP. This district is presently held by an Anglo incumbent. District 23 as drawn by SB 31 is promoted as a strong Black district that outlines the center of Dallas County, with 44.2% Black VAP, and a combined Black and Hispanic VAP of 67.7%. This Court's review of these districts and the voting tabulation districts ("VTD's") they are comprised of indicates that District 12 could be drawn as a strong minority impact district without diluting the Black voting population's chances of electing a state senator in District 23. District 12 as fashioned by this Court takes the Hispanic community concentrated in West Dallas and part of Irving and links it with the Black community in south central Tarrant County. The result is a district with a combined Black and Hispanic VAP of 48.5%. Under the Court's interim District 12, minority groups will have a significantly greater impact than in District 12 as drawn by SB 31. The Court's interim plan also increases the Black VAP in District 23 almost 2% to 45.6%, while the combined minority VAP remains strong at 64.4%. Black and Hispanic voters are thus provided a greater

degree of participation in the political process than under SB 31.

In order to ensure that District 23 contained the requisite number of Black VAP, the Court's interim plan takes a number of VTD's from District 2, presently held by an Anglo incumbent, forcing District 2 to seek population elsewhere in order to keep its deviation at an acceptable level. The configuration of the Court's interim District 12 as a minority impact district also causes District 9 to be redrawn to include some of the population that SB 31 included in District 2 southeast of Dallas. Consequently, the addition of interim District 12 causes districts 1, 2, 3, 8, 9, 22, and 30 to be slightly adjusted. This Court's review of District 9 reveals SB 31 departed radically from the traditional configuration of that district. Because the Court's drawing of District 12 as a minority impact district makes the Legislature's version of District 9 impossible to reasonably approximate, the Court's plan largely restores that district to its traditional counties of composition, and has done so without unacceptably deviating from ideal population.

Plaintiffs' remaining challenges, and this Court's only other area of concern with SB 31, involve those districts drawn by the Legislature in South Texas and the Rio Grande Valley. All parties conceded at the December 13th hearing that SB 31 was perceived as "dead on arrival" at the Justice Department because the plan failed to create stronger Hispanic districts in Bexar County, or address the concerns of Hispanic voters in the districts running South to the U.S.–Mexican Border. SB 31 only creates four (4) districts in South Texas that would appear to ensure election of a Hispanic candidate in that area. This Court concurs with those concerns, finds SB 31 likely does not comply with the mandate of Sec. 2 and interpretive case law, and has fashioned interim districts in those areas that afford Hispanics six (6) state Senate seats in South and West Texas. This Court specifically finds that Districts 19 and 26 as drawn in SB 31 likely fail to meet the requirements of Sec. 2. Under the Court's interim plan the Hispanic districts include numbers 19, 20, 21, 24, 27, and 29. These numbers correspond to SB 31's districts 19, 20, 25, 21, 27, and 29 respectively. Under SB 31, District 25 is not a Hispanic district, yet this Court's interim District 21 approximates the same geographical area. The Court was able to craft its District 21 as an Hispanic district by absorbing part of SB 31's District 26, and allowing District 21 to extend further south by redrawing the three (3) districts running through the Rio Grande Valley.

Under SB 31, District 19, the Hispanic district wholly contained in Bexar county, offers 47.6% Hispanic VAP, with only 39.3% registered voters with Spanish surnames. This Court finds that District 19 as drawn in SB 31 likely fails to comply with Sec. 2's requirement that the minority group be able to elect a candidate of its choice, because the percentage of Hispanic voter turn out is too weak. This Court was able to fashion its interim District 19 to provide 56.2% Hispanic VAP, and 48.7% voters registered under a Spanish surname. District 20 in SB 31 boasts a 58.0% Hispanic VAP and accompanying 50.6% voters registered under Spanish surnames. This Court's interim District 20 almost mirrors those numbers, but it is drawn in such a way that Districts 24 and 21 may be drawn to create one district well above the deficient level provided in SB 31's District 26, and another district approximating the percentages in SB 31's District 21. For example, interim District 24 under the Court's plan contains 54.2% Hispanic VAP with a 48.0% voters registered under Spanish surnames. SB 31's District 26 contained only 51.4% Hispanic VAP, and a remarkably lower 42.7% voters registered under Spanish surnames. This Court notes that the overall percentages in its Hispanic districts are slightly stronger than those proposed in the *Quiroz* settlement plan that received preclearance by the DOJ.

Given the Court's substantial changes to the plans as drawn for South Texas, Dallas, and North Central Texas, unrelated districts are affected. In drawing the remainder of the State to accommodate the specific changes made by the Court plan, every attempt was made to place as many

counties in the interim districts in the same numbered district as they would have been under SB 31. We consider ourselves to have been successful in this attempt, as fully half of the Senate Districts, namely those in West and East Texas, are substantially the same as under SB 31. The Court made every attempt to preserve the legislature's will in those areas of the state where no violations of the Voting Rights Act were found to occur.

### C. *Texas House of Representatives*

On November 12, 1991 the DOJ issued its objections to HB 150 in a letter transmitted to the Texas Secretary of State. Noting the most significant demographic change in Texas in the past ten years to be the increase in Hispanic population, the DOJ's objections dealt wholly with the dilution of Hispanic voting strength in El Paso, Bexar, and Dallas Counties, and voiced concerns with districts in the Rio Grande Valley and South Texas. Upon review of the letter and the DOJ's findings, this Court finds considerable merit in the specific objections and has attempted to fashion a remedial plan yet remain loyal to those portions of the state in which no DOJ objections were lodged. This was accomplished to a much greater degree than the Court's interim Senate plan because most House districts changed fell within whole counties and did not effect other lines running through the rest of the state. Other than those areas of the state touched by the DOJ's objections, this Court finds plaintiffs challenge to HB 150 fail given the state of the evidence before the Court at the present time.

Though the DOJ's objection to Dallas County is far from clear, this Court's review of Districts 99 through 114 as drawn in H.B. 150 shows that Hispanic voters were fragmented into various districts completely diluting their ability to elect a candidate of their choice in *any* district in Dallas County. This Court further finds that the Hispanic population in Dallas County has grown significantly in the past ten years to the degree Hispanics as a voting group are capable of clearly electing a candidate of their choice in a minority majority Hispanic district, and participate significantly in the election of a candidate in an Hispanic impact district. This can be accomplished without diluting the ability of Black voters to elect at least four (4) candidates of their choice in Dallas County. In attempting to fashion such districts, this Court found its efforts remarkably paralleled those of the *Mena* plaintiffs' proposals, and therefore adopts that portion of their proposed redistricting plan that encompasses Dallas County. Under the Court approved interim plan, District 104 is a Hispanic district yielding 58.5% Hispanic VAP, while District 103 is a Hispanic impact district offering 41.3% Hispanic VAP, and a combined minority VAP of 53.4%. Districts 100, 109, 110, and 111 remain at percentages strong enough for Black voters in those areas to elect candidates of their choice.

H.B. 150 apportioned El Paso County into five districts. The DOJ objected to HB 150's reduction of Hispanic population in District 76, presently held by an Anglo incumbent. Though District 76 lies between two districts with Hispanic VAP in excess of 80%, the DOJ found the Hispanic voter registration was reduced by about four percentage points without an adequate justification. This was particularly objectionable in light of the DOJ's finding that Hispanic voter registration had increased in that district over the past ten years, inferring the reduction was intended to protect an Anglo incumbent. Under this Court's interim plan, Hispanic population flowed from Districts 75 and 77 in order to increase the percentage of Hispanic VAP in District 76 from 66.7% to 72.0%. Districts 75 and 77 were reduced to Hispanic VAP's of 82.5% and 80.6% respectively. It is the opinion of this Court that the El Paso districts as drawn by the Court no longer dilute minority voting strength in District 26, and otherwise comply with Sec. 2.

The DOJ's objections to Bexar County focused on the apparent regression of Hispanic voting strength in District 117 resulting from the packing of Hispanics in District 118. While the DOJ did not object to the number of Hispanic seats drawn in H.B. 150 in Bexar County, which numbered

five (5) with Hispanic VAP above 55%, this Court finds that an interim plan can and should be drawn to provide Hispanics seven (7) districts with Hispanic VAP above 55%. This Court further finds District 117 as drawn under HB 150 is not an Hispanic seat as the Hispanic VAP is well under 55%. This Court's interim plan for Bexar County essentially mirrors the proposals offered by the *Mena* plaintiffs. Their proposals had been submitted to the DOJ in an attempt to obtain withdrawal of the Department's objections.

Objections were also made to the districts drawn in H.B. 150 located south and southwest of Bexar County, and north of Cameron and Hidalgo counties. The Legislature drew district lines 43 and 44 in an east-west manner that had the effect of packing Hispanics in the southern districts and overpopulating Anglos in the northern districts. The DOJ noted that this problem would have been alleviated had the districts been drawn in a north-south configuration, and that an additional Hispanic district could have been created. This east-west configuration was viewed by the DOJ as intended to protect an Anglo incumbent. Under H.B. 150, the Hispanic VAP of District 43 is 75.0% while the VAP of District 44 is only 46.9%. These districts as drawn by the Court maintain District 43 at 66% Hispanic VAP, while increasing the Hispanic VAP in District 44 to 54.5%, and remedy the problems identified by the DOJ.

Finally, this Court concurs with the DOJ's objections to the reduction of Hispanic VAP in District 38 to protect an Anglo incumbent. This Court's interim plan moved Hispanics from District 36 into District 38, increasing the Hispanic VAP from 67.6% to 72.9%, while maintaining the Hispanic VAP in District 36 at 74.4%. In order to arrive at an acceptable deviation level, the Court also moved a small number of Anglo voters from District 38 into District 37. This change had no appreciable effect on the Hispanic VAP in District 37.

## IV. JUDGMENT

It is the intention of this Court by this Opinion and Judgment to provide for a valid and equitable interim state legislative redistricting plan in the current circumstances in which no valid plan exists under federal law, and by this Opinion and Judgment to provide for the holding of elections in Texas without delay and in accordance with existing state law. In developing equitable interim state legislative redistricting plans the Court has sought primarily to provide new or improved state House and Senate districts that provide a realistic opportunity for the election of racial and ethnic minority candidates. Any partisan effects resulting from this effort are apparently a natural and unavoidable consequence of the Court's emphasis on the interests of long-neglected minority concerns.

This Court has sought diligently, where appropriate, to adhere to the legitimate districting intent of the state legislature and, where federal constitutional and statutory prohibitions are not offended, to give effect to the will of that body. A conscientious inquiry, however, reveals even to the most casual political historian the long history of federal court intervention in Texas redistricting schemes in order to provide minimal protection to the electoral interests of racial and ethnic minorities. While past state legislatures have paid some tribute to these important interests, partisan concerns and preservation of incumbents appear paramount on the decennial legislative agenda. The time-honored effects of adherence to these more parochial concerns have sometimes been an unspoken disservice to minority representation.

As the Regular Session of the 72nd Legislature concluded with the approval of H.B. 150 and S.B. 31, those state officials charged with presenting these legislatively-approved plans to the Department of Justice for required Voting Rights Act preclearance seemed unusually lethargic. This inaction is a central reason for the need of federal judicial action at this time in an effort to protect minorities' constitutional and statutory voting rights.

The legislative history of H.B. 150 and S.B. 31, coupled with the leisurely presentation to the Justice Department provides

this Court with no real hope that further deference to the legislature at this time would yield any result other than continued protection of some members' self-interests to the exclusion of minorities' rights. For the interim, this Court will exercise its constitutional responsibilities to provide protection to this latter group of often-neglected Texas citizens. Based on the findings and legal conclusions set forth in this Opinion it is the Judgment of this Court that the 1992 primary elections proceed as follows:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that plaintiffs' request for interim relief filed in cause number A–91–CA–428 is DENIED, and that elections should proceed on an interim basis under the congressional plan as drawn in HB 1;

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that plaintiffs' request for interim relief filed in cause number A–91–CA–426 is GRANTED, and that primary elections for the Texas Senate will be conducted under this Court's interim plan attached at Appendix A to this Judgment;

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that plaintiffs' request for interim relief filed in cause number A–91–CA–425 is GRANTED, and that primary elections for the Texas House of Representatives be conducted under this Court's interim plan attached as Appendix B to this Judgment;

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the candidate filing deadlines for the 1992 primary elections are extended to January 10, 1992;

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the residency requirement for candidates to the Texas Senate, and Texas House of Representatives are hereby waived for elections held under the State House and State Senate interim plans in 1992;

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Joint Motion for Interim Relief filed in all three causes December 6, 1991 is GRANTED, and that election precincts may be consolidated as contemplated in those motions.

GARWOOD, Circuit Judge, dissenting in part:

I join the majority's judgment and its essential reasoning in all respects except as follows:

In light of the fact that the Texas legislature has recently been called into special session commencing January 2, 1992, for the purpose of redistricting, in my view this Court's Order should expressly provide that in the event legislation is enacted effecting alternate redistricting, and/or postponement of the 1992 primary elections, and such legislation is precleared by the Department of Justice, and found not invalid by this or another court if challenged, and all this transpires in time such that review thereof by the Department of Justice and by this Court can be had and thereafter the presently scheduled 1992 primary elections, or 1992 primary elections pursuant to any such postponed date (if any such postponement is timely precleared by the Department of Justice and not sooner found invalid by this or another court), may properly take place in 1992, then the interim plan adopted by this Court shall be of no force or effect as to the body or bodies so redistricted. I believe that this much is required by deference to the legislature in these matters. *See, e.g., McDaniel v. Sanchez*, 452 U.S. 130, 101 S.Ct. 2224, 2236 n. 30, 68 L.Ed.2d 724 (1981).

## ORDER AND JUDGMENT

Before the Court is the State Defendants' Motion to Modify or Stay Judgment of December 24, 1991 said motion filed December 31, 1991. This Court has informed the plaintiffs that it would not take the motion under advisement pending expiration of the ten-day response time provided in the Local Rules and intends to rule on the instant motion before the 10th of January 1992. Plaintiffs filed their response January 8, 1991. Also before the Court is the State Defendants' Emergency Motion to Modify, Vacate, or Stay Judgment of December 24, 1991 said motion filed January 9, 1992. Upon review of the motions,

and the entire file in this case the Court finds the motions lack merit and should be DENIED.

█ State Defendants seek a stay of this Court's Judgment entered December 24, 1991 in which the Court ordered the 1992 primary elections be held pursuant to the Court's interim plans fashioned for the Texas House and Senate.[1] These plans were adopted by necessity upon this Court's finding that the legislatively-drawn plans redistricting those bodies potentially fail to adequately represent minorities as guaranteed by the Voting Rights Act. The State Defendants argue that once a federal court holds a state's election law contravenes the requirements of the Voting Rights Act, "the unbroken thread running through the federal law of redistricting and voting rights" requires this Court to allow the legislature to cure the defects in its redistricting plans *before* elections may be conducted pursuant to a Court-ordered plan. In light of the recently-concluded special session of the Texas Legislature, specifically called to attempt to pass new plans redistricting seats of the Texas House and Senate, Defendants argue this Court should stay its Judgment in the event new plans are passed, and those plans receive preclearance by the Department of Justice and pass review by this Court after hearing, all to occur before January 10, 1992.[2] While this is a correct statement of the law regarding the imposition of permanent election plans, the cases cited by the State Defendants in support of their motion also impart the bedrock principle that federal courts possess considerable latitude in affording interim relief that might otherwise exceed the traditional constraints of comity and deference to the Legislature—primarily to insure that elections take place as scheduled under valid state law. *See, e.g., McDaniel v. Sanchez,* 452 U.S. 130, 150 n. 30, 101 S.Ct. 2224, 2236

n. 30, 68 L.Ed.2d 724 (1981) (deference to legislature to devise acceptable replacement plan applies in normal case where legislature has adequate time to do so); *Wise v. Lipscomb,* 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978) (where imminence of state election renders legislative reapportionment impractical, federal courts may devise and impose interim redistricting plan pending later legislative action); *Burns v. Richardson,* 384 U.S. 73, 85, 86 S.Ct. 1286, 1293, 16 L.Ed.2d 376 (1966) (imposition of interim plan falls clearly within court's discretion to ensure elections proceed as scheduled, particularly where plan does not remain in effect after legislature adopts acceptable permanent plan); *Reynolds v. Sims,* 377 U.S. 533, 586, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506 (1964) (district court did not abuse discretion by imposing provisional plans so upcoming primary elections could proceed as scheduled, after legislature failed to apportion itself within parameters set by U.S. Constitution); *Seastrunk v. Burns,* 772 F.2d 143, 151 (5th Cir.1985) (deference to legislature stops at point court finds plan illegal under federal law, or where preclearance has not been obtained); *Jones v. City of Lubbock,* 727 F.2d 364, 387 (5th Cir.1984) (court free to impose substitute plan after hearing and upon entry of findings holding legislative scheme violates federal law); *Terrazas v. Clements,* 537 F.Supp. 514, 527–528 (N.D.Tex.1982) (panel implemented interim plans to prevent delaying elections). The United States Supreme Court refused to stay the Order in *Terrazas. Terrazas v. Clements,* 456 U.S. 902, 102 S.Ct. 1745, 72 L.Ed.2d 158 (1982).

In the present case, this Court's December 24, 1991 Judgment does no more than provide for the holding of 1992 elections as scheduled under Court-ordered interim plans that temporarily address voting rights deficiencies in the plans passed by the Texas Legislature. In denying the

---

1. Defendants do not seek to stay the portion of this Court's Judgment implementing on an interim basis the plan passed by the Legislature redistricting seats for the U.S. Congress.

2. As evidenced by the testimony of the Texas Secretary of State, January 10, 1991 is a critical

deadline, it being the latest filing date possible that would allow the 1992 primary election to proceed as scheduled under the State's statutory scheme. R. at 94; *see also* Defendant's Exhibit 13.

stay, this Court in no way intends to limit the efforts of the Legislature in adopting acceptable permanent plans at any time it sees fit. Early in the second called Session, the Texas House approved this Court's interim plan redistricting that body for the 1992 primary elections, and fashioned a substitute permanent plan to be implemented for the 1994 elections. The Texas House indicated it approved the Court plan in order to guarantee that the elections go forward as presently scheduled. The objectives of the Texas Senate do not appear to be as clearly directed solely to the interests of Texas voters.

This Court fully recognizes that it should refrain from supplanting the policy choices of the Texas Legislature as expressed in HB 150 and SB 31 to the extent this Court has not found those choices in violation of federal law. It is evident that this Court has been able to do so to the satisfaction of the Texas House. With regard to the Texas Senate, it is not evident that the Senate's dispute with this Court's interim plan centered on fair representation of minority interests; rather, it appears the Senate was primarily interested in fashioning a plan that better protects certain Anglo incumbents at the expense of minority voters' ability to elect candidates of their choice. This Court comes to such conclusion having reviewed the Senate plan submitted to this Court and the Department of Justice on the eve of the filing deadline, yet sees no indication that the Senate is attempting to devise a plan that would enhance minority voting strength over that provided in this Court's interim plan. As admitted in Defendants' January 9, 1992 motion, this substitute plan ("S.B. 1") adopted by the Legislature is identical to the one submitted by the parties in the *Quiroz* case in Hidalgo County. That "*Quiroz* plan" was before this Court during the period in which it reviewed SB 31, found that law in violation of the Voting Rights Act, and drafted its interim plan. Had this Court believed that the "*Quiroz* plan" better addressed the interests of minority voters its plan would

have more closely mirrored the Senate districts drawn by the parties in *Quiroz*.

A detailed comparison of the Court's interim plan with the "*Quiroz* plan" reveals that the Court's plan, and not *Quiroz*, provides a greater opportunity for all minority citizens of the State of Texas to elect representatives of their choosing. A cursory examination of the bottom line supports this assertion: both *Quiroz* and the Court's interim plan create nine minority majority districts, but the Court's interim plan also creates a minority impact district in the Dallas-Fort Worth metropolitan area that is lacking in the *Quiroz* plan. Additional hearing and evidence is not necessary for this Court to determine that the Legislature's adoption of *Quiroz* is not a response to minority concerns, but an impermissibly partisan reaction to this Court's superior interim plan.

In the South Texas and Bexar County area, it appears that the plans are comparable in providing minorities an ability to elect representatives. Two of the six minority majority districts appear to be stronger under the Court's plan than under the "*Quiroz* plan," namely districts 20 and 21. Under the Court's plan, 57.9% of the voting age population ("VAP") in District 20 is Hispanic, while 58.7% of the VAP in District 21 is Hispanic. The numbers for the comparable districts under the "*Quiroz* plan" (districts 20 and 19) are lower—only 57.1% and 58.2% respectively. District 27 under the Court's interim plan also appears to better address minority concerns. The Hispanic VAP in District 27 is 76.9% under the Court's plan, lower than the 78.6% present in the "*Quiroz* plan's" District 27. In light of the testimony at the December hearing that District 27 was "packed" under SB 31, this Court feels that its interim plan better responds to minority concerns regarding district 27.[3] This Court further notes that the Democratic incumbent currently residing in that district, Senator Eddie Lucio, voted against SB 1.

The "*Quiroz* plan" and Court plans appear to provide comparable protection of minorities in two of the three remaining

---

**3.** District 27 under both SB 31 and *Quiroz* have     the identical Hispanic VAP of 78.6%.

minority majority districts in the South Texas–Bexar County area. District 24 under the Court's plan has a combined minority VAP of 63.3%; the corresponding district under *Quiroz* had a slightly lower combined minority VAP of 61.5%. Similarly, District 29 under the Court's plan has a combined minority VAP of 70.1%, while District 29 under the "*Quiroz* plan" only marginally increases the combined minority VAP to 70.3%. The only district in which the "*Quiroz* plan" appears to provide significantly greater protection to minorities is District 26, which has an Hispanic VAP of 59.7% and a combined minority VAP of 65.8%. The corresponding district under the Court's interim plan is District 19, which has a lower Hispanic and combined minority VAP of 56.3% and 60.5% respectively. Given that District 19 remains a strong minority majority district under the Court's plan, this Court does not find this one district to be fatal to its plan. This Court further finds that the Democratic incumbent presently residing in this district, Senator Frank Tejeda, voted *against* the "*Quiroz* plan" stating to the print media that *Quiroz* impermissibly split the Black voters in Bexar County.

In Dallas and Harris counties, the other two counties with minority majority districts, it also appears that the Court's plan better protects the interests of minority voters. In Harris County, both plans create two minority majority districts, one commonly referred to as the "Black district" (designated as District 13 under both plans), and the other referred to as the "Hispanic district" (designated as District 15 under the Court's plan and District 6 under *Quiroz* ). The Black district is significantly stronger under the Court's interim plan, with a Black VAP seven percentage points higher and a combined minority VAP nine percentage points higher than that provided under the "*Quiroz* plan". While the Hispanic district has a higher Hispanic VAP under the "*Quiroz* plan" than under the Court's plan (57.1% as compared to 51.5%), the combined minority VAP's are virtually identical under the two plans (66.9% as compared to 66.8%). In light of the testimony given at the December hearing that minority coalition voting does exist in Harris County, we are not convinced that the Hispanic district under the "*Quiroz* plan" is significantly stronger. We are convinced, however, that the Court's interim plan better protects minority interests in Dallas and Tarrant counties. Both the "*Quiroz* plan" and the Court's plan contain a minority majority district (District 23), with almost identical combined minority VAPs of 64.4% and 64.5%, respectively. The Court's plan, however, also provides for a minority impact district spanning Dallas and Tarrant counties with a combined minority VAP of 48.5%. The "*Quiroz* plan" contains no such corresponding impact district.

In the absence of any laudable benefit to minorities, the Senate has only engaged in time-consuming partisanship. While such partisan goals may represent the policy choices of the Texas Senate, this Court finds it should not defer to those policies where doing so would result in postponement of the 1992 primary elections and the consequent tremendous drain on the public treasury for the apparent benefit of so few.

Any attempt by this Court to implement the substitute plan drafted by the Senate for the 1992 primary elections will necessarily and needlessly result in postponing those elections until at least mid-April of 1992. Under Texas law, a bill passed by a mere majority of both houses of the Legislature does not become effective as law until 90 days after adjournment of the session in which it was enacted. TEX. CONST. art. III, § 39. This would include the proposed substitute plan, any statutory scheme aimed at avoiding this Court's Orders, as well as any enactment modifying the Texas Secretary of State's authority to reschedule elections on his own initiative. Here the Court is faced with either abiding by existing state law, i.e. the present statutory scheme calling for a March 10, 1992 primary election date, or suspending all proceedings until the Legislature's new proposal postponing the elections takes effect. This Court is not persuaded that it must be held hostage to the "ninety-day rule", the effect of which would prevent

this Court from relying on existing state law. What is left before the Court for review is legislative intent regarding the treatment of minorities and the rescheduling of elections. As discussed *supra*, this Court has found that minority voting rights can be enhanced to a greater degree than provided in a *Quiroz*-style plan. As for the rescheduling of elections the Court is of the following opinion.

■ Defendants seek relief similar to that discussed in Judge Garwood's dissent in part, though a careful reading of that dissent reveals that Judge Garwood was also concerned that the primary elections proceed as scheduled, but wished to make this Court's Judgment conditional on the Legislature's ability to obtain preclearance of any substitute plan from the Department of Justice, and favorable review of that plan by this Court, all before the present filing date of January 10, 1991, or by some postponed date approved by the Department in advance. As evidenced by plaintiff's supplemental record filed January 6, 1991, it is apparent that the Department of Justice does not intend to "rubber stamp" the Senate's substitute plan even if it is identical to a previous submission that received preclearance. As part of that record, Assistant Attorney General John Dunne specifically states that any new plan submitted by the State of Texas for preclearance must now be judged against the standard of this Court's interim plan for the Senate, and that any decrease in minority voting strength in the new plan from that afforded by the Court's plan may give rise to a determination of discriminatory effect different from that reached under an identical plan reviewed in another context. Given the Department's present posture, it does not appear that preclearance of *any* substitute plans can be obtained in a timely fashion so as to allow the 1992 primaries to proceed in March as provided by existing state law. It is also clear that any plan drafted by the Legislature cannot circumvent the Sec. 5 preclearance requirement merely because it has obtained the blessing of a federal court. *Sanchez*, 452 U.S. at 153, 101 S.Ct. at 2238. In order for this Court and the parties to technically comply with the procedural requirements of Sec. 5, and the effect of Texas law, the substitute Senate plan would not be submitted to the Department for review until after the enactment becomes law in April of 1992. As expressed by Mr. Dunne, the Department would then exercise its right to examine the plan and other materials submitted for a sixty-day period. Assuming preclearance *was* obtained at the end of that time, parties plaintiff could, upon proper motion, request this Court to conduct hearings on any objections to the substitute Senate plan. In that event, it is only remotely possible that the primary elections could take place before early summer of 1992, well after the half-way point of the presidential preference campaign season.

During the December 11, 1991 hearing, the Texas Secretary of State, John Hannah, Jr., testified that postponing the primary elections would cost the taxpayers "in the neighborhood of ten to fifteen million dollars." R. at 68. As the March 10, 1992 elections involve a presidential preference primary, Hannah further testified that postponing the elections for candidates to the Texas House and Senate could confuse voters and lead to their voting twice in one primary season, a possible felony under Texas law. R. at 69. Such confusion, his testimony continued, would also reduce voter turn out. R. at 77. Hannah also testified that postponing elections could void voter registration certificates should significant changes be made in voting precincts, which would further affect voter turn out. R. at 71. Of greater significance, Hannah also testified that moving the elections to May 1992 could have the effect of reducing Hispanic voting in the Rio Grande Valley because of the migrant farm seasons. R. at 83. According to the testimony of the State Defendants' own witness, postponing the elections for candidates to the Texas House and Senate would disserve the very group of voters who remain the focus of the litigation in Hidalgo County, and whose voting strength was increased by this Court's interim plans after finding the legislatively drawn districts in The Valley did

not satisfy the requirements of Sec. 2 of the Voting Rights Act.

■ Accordingly, this Court finds the stay should be denied to avoid postponing the 1992 primary elections as presently scheduled under valid state law for the following reasons. The attempts made by the Legislature to change the election dates in the event this Court does not adopt its plan for the Senate are not effective as law at the time of this Order. Any abatement of this Court's proceedings in order to allow those enactments to become law would delay the currently valid elections. As for the federal questions presented at this time, this Court further finds any attempt to adopt the legislatively-draw Senate plan would delay the elections since preclearance of that plan has not been obtained and there has been no indication that it will be obtained in time for the elections to proceed as scheduled. Until formal comment on the substitute Senate plan ("*Quiroz* plan") has been made by the Department of Justice, elections cannot proceed under the Legislature's proposed plan as scheduled under current state law. Alternatively, should the opinion of the Department of Justice issue in the next few days, this Court has already reviewed testimony and other evidence on the Senate's substitute plan during the December hearings and finds it fails to satisfy the Sec. 2 requirements of the Voting Rights Act. Given the impending election schedule, this Court further finds that any attempt at this time to allow the Legislature to formulate a second substitute plan to cure the voting rights deficiencies is not required and would only unnecessarily delay the elections.

■ Absent Constitutional or federal statutory infirmity, this Court shall continue to avoid preempting state policy as expressed by the Legislature, despite its perception that those policies appear to be founded on purely partisan considerations. In unique circumstances, though, equity requires that deference be tempered by necessity. Implicit in the Supreme Court's willingness to vest a three-judge panel with the authority to decree that elections proceed on a timely basis is the recognition that the voting public is entitled to have some governmental body make a final determination that, at least temporarily, assures their ability to equally elect representatives of their choosing at the time set by law. After all, ensuring free and equal access to the ballot, not partisan considerations or the protection of incumbents, is the sole focus of federal law in the area of redistricting and reapportioning seats to legislative bodies. Should this Court stay its Judgment resulting in the postponement of elections, it is inevitable that new challenges to the substitute plans passed by the Legislature will be brought, and the litigation that has already consumed considerable state and federal judicial resources will begin anew. A state court in Hidalgo County, for example, has already attempted to extend the filing deadline for candidates to the Texas House in order to accommodate litigation challenging HB 150 and SB 31 under Texas law. Were this Court persuaded by the State Defendants' argument that it must always allow the Legislature to cure the redistricting plans found in violation of the law by this Court, it is conceivable that the elections could be rescheduled ad infinitum. This Court will not further the State's attempt to use the thread of deference running through the federal law of redistricting and voting rights as a cordon preventing the voting public from expressing its collective will at the ballot until certain Anglo incumbents are more comfortable with their chances of success.

ACCORDINGLY IT IS ORDERED, ADJUDGED AND DECREED that the State Defendants' Motion for Stay is in all things DENIED, and that the 1992 primary elections proceed as presently scheduled under state law, with an election date of March 10, 1992;

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that primary elections for the Texas Senate and Texas House of Representatives be conducted under this Court's interim plans attached as Appendices A and B to this Court's Judgment entered December 24, 1991;

IT IS FURTHER ORDERED that the candidate filing deadlines for the 1992 primary elections to all offices remains January 10, 1992;

IT IS FURTHER ORDERED that the Commissioners Court of Bexar County, Texas is included as a party to the Joint Motion for Interim Relief filed in the these causes December 6, 1991, and that Dallas County, Harris County, and Bexar County may consolidate their county election precincts as contemplated in that joint motion.

GARWOOD, Circuit Judge, dissenting in part:

I respectfully dissent as to the Senate (Cause No. 91–CA–426). I would:

(1) Order a hearing on the Senate Plan (SB1 2nd CS) for early next week.

(2) Order that if before January 17 the Justice Department has determined that SB1 is not entitled to preclearance, the primary elections be held on the March 10 schedule and in accordance with our prior order.

(3) Order that if before January 17 the Justice Department has not acted with respect to preclearance on SB1, the primary elections be held April 11 pursuant to the schedule fixed in the legislation adopted earlier this month.

(4) Order that if the Justice Department preclears SB1 before January 17, this court should immediately issue its order with respect to whether SB1 complies with section 2 of the Voting Rights Act and the United States Constitution; if it does, the primary elections should go forward March 10 on the basis of SB1 with appropriate modifications of the filing dates for the Senate; if it does not, this court's plan should be used for such elections.

Even though SB1 does not maximize minority representation and appears to do so to a lesser extent than the Senate plan previously ordered by this court, that does not necessarily mean that SB1 violates section 2. *See Seastrunk v. Burns*, 772 F.2d 143 (5th Cir.1985).

(5) If as a result of the above the primary elections are to be held April 11, but if the Justice Department has not precleared SB1 prior to February 18 (the date fixed in the legislation enacted earlier this month), or if we should find SB1 to be invalid under section 2 or the Constitution notwithstanding preclearance by the Justice Department, then the April 11 primary elections should be held using the plan previously ordered by this court.

(6) If the primary elections are to be held April 11 as per the above, and before February 18 the Justice Department preclears SB1 and we do not find it invalid under section 2 or the Constitution, then April 11 primary elections should be held using SB1 for the Senate.

Under *McDaniel v. Sanchez*, 452 U.S. 130, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981), we cannot pass on SB1 until the Justice Department has acted on it for preclearance purposes, but if it is precleared and we do not find it invalid, then *McDaniel* likewise teaches us we should give it appropriate legislative deference, notwithstanding the superiority of the plan ordered by this court.