**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**EAST BATON ROUGE PARISH
SCHOOL BOARD et al.,
Defendants-Appellees.**

No. 76–4102.

United States Court of Appeals,
Fifth Circuit.

April 26, 1979.

Cheney C. Joseph, Jr., U. S. Atty., Baton Rouge, La., J. Stanley Pottinger, Asst. Atty. Gen., Gerald W. Jones, John P. Mac-Coon, Brian K. Landsberg, Marie E. Klimesz, Attys., Walter W. Barnett, Drew S.

Days, III, Asst. Atty. Gen., U. S. Dept. of Justice, Civil Rights Div., Washington, D. C., for plaintiff-appellant.

John F. Ward, Jr., Baton Rouge, La., for defendants-appellees.

Before THORNBERRY, GODBOLD and HILL, Circuit Judges.

THORNBERRY, Circuit Judge:

In 1976 the United States brought suit under the Voting Rights Act, 42 U.S.C. §§ 1971(a), (c), 1973, and 1973j(d),[1] attacking the multi-member ward system of electing members of the East Baton Rouge Parish School Board.[2] Upon motion of the Board, the district judge dismissed the suit for failure to state a claim,[3] in that the United States was barred by a prior unsuccessful suit by private plaintiffs[4] from liti-

1. 42 U.S.C. § 1971:

(a)(1) All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding.

(c) Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b) of this section, the Attorney General may institute for the United States, or in the name of the United States, a civil action or other proper proceeding for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order. If in any such proceeding literacy is a relevant fact there shall be a rebuttable presumption that any person who has not been adjudged an incompetent and who has completed the sixth grade in a public school in, or a private school accredited by, any State or territory, the District of Columbia, or the Commonwealth of Puerto Rico where instruction is carried on predominantly in the English language, possesses sufficient literacy, comprehension, and intelligence to vote in any election. In any proceeding hereunder the United States shall be liable for costs the same as a private person. Whenever, in a proceeding instituted under this subsection any official of a State or subdivision thereof is alleged to have committed any act or practice constituting a deprivation of any right or privilege secured by subsection (a) of this section, the act or practice shall also be deemed that of the State and the State may be joined as a party defendant and, if, prior to the institution of such proceeding, such official has resigned or has been relieved of his office and no successor has assumed such office, the proceeding may be instituted against the State.

42 U.S.C. § 1973:

No voting qualification or prerequisite to voting, or standard practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color.

42 U.S.C. § 1973j(d):

Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section 1973, 1973a, 1973b, 1973c, 1973e, 1973h, 1973i, or subsection (b) of this section, the Attorney General may institute for the United States, or in the name of the United States, an action for preventive relief, including an application for a temporary or permanent injunction, restraining order, or other order, and including an order directed to the State and State or local election officials to require them (1) to permit persons listed under this subchapter to vote and (2) to count such votes.

2. As presently constituted, the Board is divided geographically into three wards, with seven members elected from Ward 1 and three members from Ward 2, and two members from Ward 3.

3. Although characterizing this motion as for failure to state a claim was erroneous, we will review his action as a summary judgment since the district court considered matters outside the pleadings. *See Moch v. East Baton Rouge Parish Sch. Bd.*, 548 F.2d 594 (5 Cir.), *cert. denied*, 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 132 (1977).

4. This suit was brought in 1972 by several black residents of the Parish asserting violation of voting rights. The district court dismissed for failure to state a claim, and this court affirmed on appeal. *Bryant v. East Baton Rouge Parish Sch. Bd.*, No. 72–3075 (5 Cir., Feb. 9, 1973). In 1974 several blacks filed an action asserting similar allegations. The district court dismissed on grounds of res judicata. On appeal, this court remanded for determination of whether application of res judicata would re-

gating the legality of the system and that the failure of the Attorney General to enter an objection to a change in the system submitted under § 5 of the Act, 42 U.S.C. § 1973c, estopped the United States from subsequent action. The United States appeals. We reverse and remand.

### I.

■ The United States argues that the district court erred in applying res judicata arising from a prior suit brought by private plaintiffs. The United States asserts that since it was not a party to that prior litigation, it could not be bound. The district court rejected this argument, based upon his conclusion that the private plaintiffs and the United States were identical "for all practical purposes." We believe the district court concluded erroneously.

■ First, the district court's conclusion is directly contrary to the general principle of law that the United States will not be barred from independent litigation by the failure of a private plaintiff. *See, e. g., City of Richmond v. United States*, 422 U.S. 358, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975); *Sam Fox Pub. Co. v. United States*, 366 U.S. 683, 81 S.Ct. 1309, 6 L.Ed.2d 604 (1961); Restatement (Second) of Judgments § 85, Comment d (Tent. draft No. 2, April 15, 1975). *Cf. Durfee v. Duke*, 375 U.S. 106, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963) (private action would not bind a state). This princi-

ple is based primarily upon the recognition that the United States has an interest in enforcing federal law that is independent of any claims of private citizens. In the present context the Supreme Court has characterized this as "the highest public interest in the due observance of all constitutional guarantees." *United States v. Raines*, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960). Also, any contrary rule would impose an onerous and extensive burden upon the United States to monitor private litigation in order to ensure that possible mishandling of a claim by a private plaintiff could be corrected by intervention.[5]

■ Second, even assuming that the United States has no independent interest, the prior suit would not bar the present action. In *United States v. Texas*, 430 F.Supp. 920 (S.D.Tex.1977), a three-judge district court was faced with the same contention. The court, applying the analysis of *Southwest Airlines Co. v. Texas International Airlines, Inc.*, 546 F.2d 84 (5 Cir.), *cert. denied*, 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977),[6] found res judicata inapplicable because the prior private suits were not certified as class actions, and, therefore, the United States could represent the interests of members of the putative class who were not named plaintiffs in the previous suits. 430 F.Supp. at 926. Similarly, in the present case, although the private suit was brought as a class action, the trial judge did not certify a class prior to the dismissal.

---

suit in manifest injustice or was foreclosed because of possible intervening changes in the law. *See Moch v. East Baton Rouge Parish Sch. Bd.*, 548 F.2d 594 (5 Cir.), *cert. denied*, 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 132 (1977).

5. Our conclusion is not inconsistent with *Montana v. United States*, —— U.S. ——, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). In *Montana* the Supreme Court held that collateral estoppel could be applied against the United States despite the fact that the United States was not a party to the prior litigation. The Court concluded that the United States effectively ran the prior litigation, and therefore had been actually, if not formally, present in the first suit. In the present case, the Board does not contend nor does the record reflect that the United States participated in any manner in the prior suit.

6. *Southwest Airlines* determined that a prior suit by the City of Dallas would bar a subsequent suit by private plaintiffs. Applying the reasoning of Restatement (Second) of Judgments § 85 (Tent. draft No. 2, April 15, 1975), the court determined that the City had adequately represented the interest of the private plaintiffs. Unlike the court in *United States v. Texas*, we are not entirely convinced that the reasoning of *Southwest Airlines* transfers without difficulty to the converse situation. As recognized in § 85(d), governments are by their nature representative of the cumulative rights of private individuals, and barring subsequent suits can be appropriate under certain circumstances. However, to assume that private individuals can properly be viewed as representative of a particular government is a more daring analytical leap. In this case we need not decide if the leap would be successful.

Res judicata, therefore, could not properly apply to members of the putative class, or, derivatively, to the United States.[7]

## II.

■ The district court also dismissed on the grounds of statutory preclusion, because the Attorney General entered no objection to a change in the system when the change was submitted to him pursuant to § 5 of the Act, 42 U.S.C. § 1973c.[8] The crux of this argument is that once the Attorney General has precleared a plan under § 5, the United States has exhausted any interest in the plan and is barred from any subsequent suit. Even assuming that this principle is correct,[9] we do not believe that preclearance of a change in this election plan pre-

7. In his oral decision the district judge stated in reference to his failure to certify a class in prior cases:

> For example, in many, many instances, in cases involving public accommodations where it is obvious that if an injunction is granted in favor of one plaintiff against a particular establishment, saying that they cannot discriminate against members of a particular race, it does not serve any useful purpose to go through all of the details of designating a class because the class is the plaintiff, and if it operates in favor of the plaintiff, it automatically benefits all of the class, whether they are designated or not.

The district court is correct to the extent he characterizes the possible class-wide effects of affirmative relief for the plaintiffs. This fact does not justify applying res judicata to bar members of the putative class. Any other conclusion would effectively vitiate F.R.C.P. 23.

In *Moch* the district court apparently dismissed upon the same perception of the class-wide binding effect of *Bryant*. On appeal, the court did not address this issue.

8. Section 1973c provided:

> Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the first sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification of prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the second sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the Attorney General's failure to object nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure.

9. This conclusion is not ineluctable. Congress added § 5 to provide a federal threshold safeguard against ingenious attempts to contravene the fifteenth amendment, because it considered case-by-case litigation of such changes woefully inadequate. *See United Jewish Organizations v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977); *Beer v. United States,* 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976). Section 5 was intended to require an initial examination in order to ensure that all changes were reviewed at some time; there is no indication that preclearance under § 5 precludes the general enforcement powers of the United States. *But cf. United States v. Bd. of Comm'rs of Sheffield,* 430 F.Supp. 786 (N.D. Ala.1976), *rev'd,* 435 U.S. 110, 98 S.Ct. 965, 55 L.Ed.2d 148 (1978) (Attorney General precluded from challenging change pursuant to § 5 after clearance). In fact, preclusion of the United States after clearance would produce an anomaly, since neither the affected political unit nor private plaintiffs would be foreclosed from litigating the constitutionality of the claim regardless of the Attorney General's response. In fact, an objection by the Attorney General is not conclusive against the political unit concerning compliance with § 5. Moreover, preclusion after § 5 clearance would foreclose governmental action even if the initial response were to become unsupportable because of a subsequent change in the law or demography.

The United States also argues that § 5 provides for subsequent actions by the government, pointing to the following language:

cludes the United States from challenging the total multi-member ward system.

Under § 5, if any covered political unit seeks to change any "voting qualification or prerequisite to voting, or standard, practice, or procedure," it must either seek a declaratory judgment in the D.C.Circuit or submit the change to the Attorney General for determination of whether the change has the purpose or the effect of diluting black votes. The scope of the § 5 inquiry is restricted to changes implemented after November 1, 1968. In the present case, the only change submitted was the addition of a twelfth seat on the Board.[10] The essential assumption of the Board's argument is that clearance of a change in a plan necessarily sanctions the total plan. This assumption, however, is not logically compelled. As the government asserted at oral argument, a change in a plan could pass muster under § 5 because the particular change did not exacerbate any existing dilution of black votes. Moreover, under the analysis of *Beer v. United States*, 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976), the Attorney General could not have considered the validity of the underlying plan in preclearing the change. In *Beer* the Supreme Court held

that there was no authority under § 5 to reject a proffered submission because of objections to elements of a pre-existing election plan that predated the operative statutory date.[11] In the present case, the multi-member district method had been established in 1946, and, therefore, the clearance of the proposed change could not have encompassed the pre-existing plan.[12]

REVERSED AND REMANDED.

> neither the Attorney General's failure to object nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure.

We pretermit any determination of the correctness of the interpretation by the United States. No case has directly addressed this language in the present context; they have only affirmed that private plaintiffs can challenge a plan even after § 5 clearance. *See, e. g., United Jewish Organizations v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977).

10. The only evidence presented concerning the nature of the change submitted was a cover letter from the Board's counsel to the Attorney General referring to an enclosed resolution of the Board. The letter stated,

> The East Baton Rouge Parish School Board, acting under authority of Louisiana Revised Statutes 17:71.1 et seq., and the referred to decisions of the United States Supreme Court, has corrected such malapportionment by adoption of the enclosed resolution at its regular meeting of October 14, 1971, increasing the size of the school board from eleven (11) members to twelve (12) members with

> the additional member to be elected by the residents of Ward 2 at the already scheduled elections to be held in the coming summer of 1972.

We fail to see how the district court could have concluded that the validity of the total plan necessarily was submitted for clearance.

11. The Board argues that *Beer* is irrelevant to the present discussion because preclearance in this case occurred in 1971, five years before *Beer*. In examining the legal effect of the Attorney General's action, however, we are bound to apply the law as it is presently constituted, absent compelling circumstances. *See Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). We perceive no such circumstances in the present case.

12. The Board also asserts that the district court's dismissal can be supported by the doctrine prohibiting post-election relief if pre-election relief has been deliberately bypassed. *See Toney v. White*, 488 F.2d 310 (5 Cir. 1973) (en banc). In our examination of the skimpy factual record, however, we cannot say that the Board carried its heavy burden of proving deliberate bypass.