Louis **TERRAZAS**, et al., Plaintiffs,

v.

Bob **SLAGLE**, et al., Defendants.

**Civ. Nos. A–91–CA–425, A–91–CA–426 and A–91–CA–428.**

United States District Court,
W.D. Texas,
Austin Division.

April 5, 1993.

John N. McCamish, Jr., Kevin M. Warburton, McCamish, Martin & Loeffler, San Antonio, TX, Jonathan D. Pauerstein, McCamish, Ingram, Martin & Brown, San Antonio, TX, for plaintiffs.

David Sibley, pro se.

James P. Allison, Bob Bass, C. Rex Hall, Jr., Allison & Associates, Austin, TX, Renea Hicks, Javier Guajardo, Office of Atty. Gen. Austin, TX, for defendants.

Before GARWOOD, Circuit Judge and HUDSPETH and WALTER S. SMITH, Jr., District Judges.

### ORDER AND REASONS

PER CURIAM.

Before this Court are plaintiffs' motion for summary judgment on their 42 U.S.C. § 1973 et seq. (section 2) claim in cause number A–91–CA–426; and the motions for summary judgment of the state defendants and defendant Bob Slagle (Slagle) in cause numbers A–91–CA–425, A–91–CA–426, and A–91–CA–428. Upon review of the motions and supporting affidavits, the responses filed, the record of this case, and argument presented, this Court denies plaintiffs' motion and grants the defendants' motions for summary judgment.

### Facts and Prior Proceedings

The complex procedural background of these cases is described in *Terrazas v. Slagle,* 789 F.Supp. 828 (W.D.Tex.1991). In *Terrazas,* on December 24, 1991, this Court, following an evidentiary hearing earlier that month, granted the plaintiffs' request for preliminary injunctive relief concerning the state redistricting plans as embodied in House Bill 150 (H.B.150) and Senate Bill 31 (S.B.31), enacted earlier that year, and ordered the implementation of interim 1992 redistricting plans for the Texas House of Representatives (A–91–CA–425) and the Texas Senate (A–91–CA–426), extending to January 10, 1992, the filing deadline for the regularly scheduled March 10, 1992, primary elections. *Id.* at 839. This Court noted "[a]s it stands at the time of this Opinion, there are no legal plans reapportioning seats for election to the Texas House or Senate that have been precleared by the DOJ." *Id.* at 832. We denied any relief as to the state's congressional redistricting plan (A–91–CA–428). *Id.*

After this Court's interim redistricting plans were thus imposed, the 72nd Texas Legislature convened its third called session on January 2, 1992, and adjourned on January 8, 1992. During this session the legislature passed a bill (H.B.1) redistricting the Texas House "beginning with the election of the 74th Legislature" (the 1994 elections), but no legislation was enacted respecting House redistricting for the 1992 elections. *See* Tex.Rev.Civ.Stat.Ann. art. 195a–11 (West 1993). Also at that session, the legislature passed a bill (S.B.1) redistricting the Texas Senate, stating that it "takes effect beginning with the election of the 73rd Legislature," *i.e.,* beginning with the 1992 elections. *See* Tex.Rev.Civ.Stat.Ann. art. 193c (West 1993). The senatorial districts provided for in S.B.1 are virtually the same as those in the *Quiroz* plan, which was created as the result of a settlement in the state case, *Quiroz v. Richards.*

On January 9, 1992, the state defendants filed a motion to modify or vacate this Court's December 24 order in respect to the Texas Senate and House. The state's motion was denied in our January 10, 1992, order. *Terrazas,* 789 F.Supp. at 839. In that order this Court observed that "[a] detailed comparison of the Court's interim plan with the '*Quiroz* plan' reveals that the Court's plan, and not *Quiroz,* provides a greater opportunity for all minority citizens of the State of Texas to elect representatives of their choosing." *Id.* at 841. This Court further noted that under the Texas Constitution, S.B.1 could not take effect until mid-April 1992, so that "the Court is faced with either abiding by existing state law, *i.e.,* the present statutory scheme calling for a March 10, 1992 primary election date, or suspending all proceedings until the Legislature's new proposal postponing the elections takes effect." *Id.* at 842. Additionally, the order observes that neither S.B.1 nor any legislative postponement of elections could be effective unless and until precleared under section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. *Id.* at 843. Because of these factors, it was concluded that if S.B.1 were to be utilized "it is only remotely possible that the primary elections could take place before early summer of 1992." *Id.* After noting the testimony of the Texas Secretary of State that postponing the elections past the established March 10, 1992, date, which was also the date for the presidential preference primary, would cost millions of dollars, "could confuse voters" and "reduce voter turn out," and "that moving the elections to May 1992 could have the effect of reducing Hispanic voting in the Rio Grande Valley," *id.,* this Court held that "the stay should be denied to avoid postponing the 1992 primary elections as presently scheduled under valid state law." *Id.* at 844. The order also noted, in the alternative, that even if the Department of Justice were to timely preclear S.B.1, the Court was of the opinion that S.B.1 failed to satisfy the requirements of section 2 of the Voting Rights Act, 42 U.S.C. § 1973. *Id.* at 844.

On February 25, 1992, the United States District Court for the District of Columbia, in a suit brought by Texas under section 5 of the Voting Rights Act to preclear S.B.1, ruled that the Attorney General's November 1991 preclearance of the *Quiroz* plan did not as a matter of law constitute section 5 preclearance of S.B.1 or automatically entitle the state to such preclearance. *Texas v. United States,* 785 F.Supp. 201 (D.C.D.C.1992).

The primary elections for the Texas Senate and House (as well as other offices) were held March 10, 1992 according to this Court's December 24 order and in the districts established thereby, as were also the subsequent run-off primaries in April 1992. The nominees of the parties for the 1992 general election for the senate (and other offices) were thus selected. In the Democratic primary in one of the Court's designated minority districts, District 15 in Harris County, the hispanic candidate lost to the anglo candidate. During this time the defendants appealed this Court's December 24 and January 10 orders to the United States Supreme Court, and also made requests to that Court for a stay of those orders. All the requests for stay were denied. *See Richards v. Terrazas,* —— U.S. ——, 112 S.Ct. 924, 116 L.Ed.2d 924 (1992); *Richards v. Terrazas,* —— U.S. ——, 112 S.Ct. 1073, 117 L.Ed.2d 278 (1992); *Slagle v. Terrazas,* —— U.S. ——, 112 S.Ct. 1075, 117 L.Ed.2d 278 (1992). On June 29, 1992, the Supreme Court in the State Defendants' appeal entered its order stating that "[t]he judgment is affirmed." *Richards v. Terrazas,* —— U.S. ——, 112 S.Ct. 3019, 120 L.Ed.2d 891 (1992).

On July 27, 1992, the United States District Court for the District of Columbia issued a further opinion and order in the mentioned suit brought by the state pursuant to section 5 of the Voting Rights Act seeking preclearance of S.B.1. *Texas v. United States,* 802 F.Supp. 481 (D.C.D.C.1992) (*Texas II* ). The *Terrazas* plaintiffs were permitted to intervene. The state filed a motion for summary judgment supported by unrebutted affidavits, and based on this uncontroverted evidence the court rendered judgment granting preclearance to the S.B.1 redistricting plan under section 5 of the Voting Rights Act. Following this decision, on August 6, 1992, defendant and Texas Secretary of State John Hannah (Hannah) promulgated a directive that in substance ordered the 1992

general election for the state senate to be held in the districts provided for in the now precleared S.B.1 redistricting plan, but utilizing nominees selected in the same numbered (but geographically distinct) districts under this Court's plan in the March and April 1992 primaries. On August 21, 1992, this Court issued its order enjoining the implementation of the Hannah directive because the directive itself had not been precleared and contradicted our December 24 and January 10 orders.

On October 5, 1992, the Supreme Court, in Slagle's appeal from this Court's December 24, 1991 and January 10, 1992, orders, entered its order that "[t]he judgment is affirmed." *Slagle v. Terrazas,* —— U.S. ——, 113 S.Ct. 29, 121 L.Ed.2d 3 (1992).

The general elections for the Texas Senate and House (as well as other offices) were held November 3, 1992, according to this Court's December 24, 1991, order.

After the elections, this Court requested motions for summary judgment from the parties. The state had already filed on August 28, 1992, a motion to dismiss for mootness, or, alternatively, for partial summary judgment on the plaintiffs' senate action, which attacked the repealed S.B.31. On December 7, 1992, the plaintiffs requested leave to file an amended complaint that challenged S.B.1, which this court subsequently granted on January 19, 1993. Also on December 7, the plaintiffs filed a motion for summary judgment on the section 2 complaint in the senate action, and the state and Slagle filed motions for summary judgment on the congressional, house, and senate actions.

## Discussion

### I. Summary Judgment Standard

Summary judgment may be granted where the Court finds that there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Brown v. Southwestern Bell Tel. Co.,* 901 F.2d 1250, 1255 (5th Cir.1990). After adequate time for discovery, once a proper motion for summary judgment is made pointing out the absence of genuine issues of material fact, whether or not supported by affidavits, summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. The moving party need not negate the opponent's claim (on which the opponent has the burden of proof at trial). *Id.* 477 U.S. at 323, 106 S.Ct. at 2553. The opponent must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* A summary judgment motion may not be opposed by "the mere pleadings themselves." *Id.* We review any evidence and inferences in a light most favorable to the nonmovant. *Barrett Computer Services, Inc. v. PDA, Inc.,* 884 F.2d 214, 216 (5th Cir.1989).

### II. House Action, CA–425

■ Plaintiffs conceded in their responses to the state's and Slagle's motions for summary judgment on the plaintiffs' challenge to the repealed house redistricting plan that "dismissal for mootness may be proper ... [b]ecause there is no current challenge to the existing plan." We agree. As held in *Kremens v. Bartley,* 431 U.S. 119, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977), "The fact that the Act was passed after the decision below does not save the named appellees' claims from mootness. There must be a live case or controversy before this Court, and we apply the law as it is now, not as it stood below." *Id.* 431 U.S. at 128–29, 97 S.Ct. at 1715. Since the plaintiffs challenged only H.B.150, and failed to challenge the current house plan as embodied in H.B.1, their claims are moot and we dismiss without prejudice the house action.

### III. Senate Action, CA–426

■ Both the plaintiffs and defendants seek summary judgment on the senate section 2 claim. The defendants also seek summary judgment on the related constitutional claim, and further on the separate partisan gerrymandering claim. At the summary judgment hearing, the plaintiffs were asked,

"do you have some evidence before the court with respect to partisan gerrymandering regarding the Texas Senate?" The plaintiffs' counsel responded, "the answer to your question is no, we do not." Since the plaintiffs had the burden of proof on the partisan gerrymandering claim, their admission that they had no evidence on the claim requires us to render summary judgment for defendants on the senate partisan gerrymandering claim.

The plaintiffs, in seeking summary judgment on their section 2 claim concerning S.B.1, carry the burden of proof to establish the elements of a section 2 violation. *Thornburg v. Gingles,* 478 U.S. 30, 49, 106 S.Ct. 2752, 2766, 92 L.Ed.2d 25 (1986); *Overton v. Austin,* 871 F.2d 529, 538 (5th Cir.1989). However, within their motion for summary judgment they fail to point to any evidence supporting their claim and at the summary judgment hearing admitted that they had no affidavits on that claim. Instead, the plaintiffs' entire argument is based on one sentence contained in this Court's January 10, 1992, order denying a stay of this Court's December 24, 1991, preliminary injunction. The January 10, 1992, order recognized that under state law S.B.1 could not be effective until ninety days after the close of the legislative session, which would not allow for its implementation until after the scheduled March 10, 1992 primaries.[1] Furthermore, at that time S.B.1 had not been precleared by the Justice Department and there was no indication if or when such preclearance would occur.[2] Given these uncertainties, implementation of S.B.1 would require postponing the senate primaries until the late spring, at the earliest. This Court concluded that such a delay would have an adverse impact on his-

panic voters and voter turnout and would cost the state millions of dollars. Therefore this Court refused to stay its order of December 24, 1991, in order to have a section 2 hearing on S.B.1 or to allow the Department of Justice to determine whether S.B.1 should be precleared under section 5. This Court then, almost in passing, stated: "Alternatively, should the opinion of the Department of Justice issue in the next few days, this Court has already reviewed testimony and other evidence on the Senate's substitute plan during the December hearings and finds it fails to satisfy the Sec. 2 requirements of the Voting Rights Act." *Terrazas,* 789 F.Supp. at 844.

This Court in its December 24, 1991, order had before it no Texas senate reapportionment plan that was valid under state law and had been precleared under section 5. The elections were fast approaching; the primary filing deadline would expire January 2, 1992. The senate redistricting bill enacted earlier in 1991, S.B.31, had at the last minute been withdrawn by the state from requested Justice Department preclearance under section 5. However, all parties before us agreed that "S.B.31 was perceived as 'dead on arrival' at the Justice Department." *Terrazas* at 836. This Court found that certain districts in S.B.31 "likely fail to meet the requirements of Sec. 2." *Id.* That was the only senate plan valid under state law before us. As to the *Quiroz* plan, we held "[t]his Court specifically finds that the *Quiroz* settlement plan is not valid under state law, but merely an alternative proposal submitted to the Court that because of the actions of the Secretary of State happened to receive favorable review by the DOJ." *Id.* at 835.[3] We

1. S.B.1 could not be immediately implemented upon passage and signature by the governor because it did not pass by a two-thirds vote. As we noted in *Terrazas,* "Under Texas law, a bill passed by a mere majority of both houses of the Legislature does not become effective as law until 90 days after adjournment of the session in which it was enacted." 789 F.Supp. at 842; Tex. Const art. III, § 39.

2. The defendants argued that the November 1991 preclearance of the identical *Quiroz* plan could somehow be transferred to S.B.1. This contention was rejected by this Court and by the D.C. District Court. *See Terrazas,* 789 F.Supp. at 844;

*Texas v. United States,* 785 F.Supp. 201, 204 (D.D.C.1992).

3. We do not regard the *Quiroz* litigation settlement as comparable to the good faith state court plan referred to by the Supreme Court in *Growe v. Emison,* —— U.S. ——, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993). The Texas Supreme Court vacated the *Quiroz* settlement because there had been no adversary proceeding. *Terrazas v. Ramirez,* 829 S.W.2d 712 (Tex.1991). We also note that in *Growe* the Supreme Court remarked, "Of course, the District Court would have been justified in adopting its own plan if it had been apparent that the state court, through no fault of

**1168**

concluded that our own plan was superior to the *Quiroz* plan. *See id.* at 835–36.

This Court determined that essentially the same situation was before it in ruling January 10, 1992, on the defendants' motions to modify, vacate, or stay the December 24, 1991, order. While S.B.1, virtually the same as the *Quiroz* plan, had by then been enacted, it could not be effective under state law before mid-April, and nor could legislation postponing the March 10, 1992, primaries; moreover, S.B.1 had not been precleared (see note 2, *supra*), nor had any state action postponing the primaries.

Once this Court decided that it should not delay the senate primaries in order to allow S.B.1 to be considered by it under section 2 and by the Justice Department under section 5, the Court then had to decide which plan to adopt in the interim. This Court in its January 10 order elected to continue to implement the Court's own plan in preference to the *Quiroz* plan. The focus of the decision was whether the court plan was better than the *Quiroz* plan. The Court concluded that it was. *Id.* at 841.[4] However, this core conclusion was not based on the finding of a section 2 violation. Indeed, we could not find such a violation by merely comparing the two plans because the proper legal analysis under

section 2 is, sensibly enough, to determine whether the proffered plan meets the requirements of section 2, not whether there could be a superior court drawn plan. *See Seastrunk v. Burns*, 772 F.2d 143, 151 (5th Cir.1985) (holding that "the federal district court is precluded from substituting even what it considers to be an objectively superior plan for an otherwise constitutionally and legally valid plan that has been proposed and enacted by the appropriate state governmental unit"). *See also id.* at 153, 155.

■ Since no then valid state plan was before us, the Court concluded that whatever plan was implemented had to be a court plan, and this Court considered it was free to choose what it believed to be the best interim plan for minorities, and determined that the Court plan was superior to the *Quiroz* plan proffered by the state. None of these determinations required a decision on the *Quiroz* plan under section 2. At most, the statement in the January 10, 1992, opinion cited by the plaintiffs as a determination that S.B.1 violated section 2 is a mere alternative finding that was superfluous to the holding then made.[5]

■ Moreover, such a finding in a preliminary injunction setting is not binding on the merits. The Supreme Court recognized that "[a] party . . . is not required to prove his

the District Court itself, would not develop a redistricting plan in time for the primaries."

4. The January 10 order states that "the bottom line" is that "both *Quiroz* and the Court's interim plan create nine minority majority districts, but the Court's interim plan also creates a minority impact district in the Dallas–Fort Worth metropolitan area that is lacking in the *Quiroz* plan."

5. We also note that the conclusory statement that S.B.1 violated section 2 is not the character of explanation that would have been made had a section 2 violation been the basis of the January 10 order. The Fifth Circuit has frequently held that in order to determine that an enacted state plan violated section 2, a district court must make detailed findings of fact supporting its decision. *See*, *Westwego Citizens For Better Gov't v. Westwego*, 872 F.2d 1201, 1203 (5th Cir.1989) (noting that "[w]e have stressed repeatedly the special need for detailed findings of fact in vote dilution cases"). The plaintiffs apparently recognized that the conclusory statement was not the result of a review of S.B.1 under section 2. In the plaintiffs' brief to the Supreme Court defending the validity of the January 10 order, they

admitted that "it is not accurate to say that the lower court considered SB1 before issuing its decision."

Nor do the Supreme Court's summary affirmances here change the analysis. It has long been recognized that "[a] summary disposition affirms only the judgment of the court below, and no more may be read into [the Supreme Court's] action than was essential to sustain that judgment." *Anderson v. Celebrezze*, 460 U.S. 780, 784, n. 5, 103 S.Ct. 1564, 1568 n. 5, 75 L.Ed.2d 547 (1983). Also, summary affirmance of a three-judge court decision "affirm[s] the judgment but not necessarily the reasoning by which it was reached." *Fusari v. Steinberg*, 419 U.S. 379, 391, 95 S.Ct. 533, 541, 42 L.Ed.2d 521 (1975) (C.J. Burger, concurring). Here, the clear basis for the affirmances was that this Court was permitted to fashion interim relief where the state failed to have a precleared senate redistricting plan, then valid under state law, in existence at the time the interim relief was fashioned and needed. There was no necessity for the Supreme Court to consider the alternative "finding" on the section 2 issue because no precleared plan existed to be analyzed.

case in full at a preliminary-injunction hearing and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981) (citations omitted); *Griffin v. Box,* 910 F.2d 255 (5th Cir.1990). The *Camenisch* court concluded that it is "inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits." 451 U.S. at 395, 101 S.Ct. at 1834. The Fifth Circuit has held that not only is such a judgment inappropriate but it can constitute reversible error. *See H & W Indus., Inc. v. Formosa Plastics Corp.,* 860 F.2d 172, 179 (5th Cir.1988). Given the superfluous nature of the alternative finding within a preliminary-injunction context, we decline to hold that such a bald statement is binding on the parties at final disposition on the merits.[6] Therefore, we deny the plaintiffs' motion for summary judgment.

■■■■■ Turning to the defendants' motions for summary judgment on the senate section 2 claim, we note that they do not carry the burden of proof and need only point to the plaintiffs' lack of sufficient evidence on this claim. *Celotex, supra; Voinovich v. Quilter,* —— U.S. ——, ——, 113 S.Ct. 1149, 1156–57, 122 L.Ed.2d 500 (1993). The defendants argue that the plaintiffs have failed to establish a *prima facie* case under the *Gingles* framework. *Gingles, supra.* As explained by the Fifth Circuit, under this threshold test, the plaintiffs challenging an at-large election scheme must demonstrate: "(1) that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) that the minority group is politically cohesive; and (3) that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Brewer v. Ham,* 876 F.2d 448, 451 (5th Cir.1989); *see also Voinovich,* —— U.S. at ——, 113 S.Ct. at 1156–57 (holding that "the *Gingles* preconditions apply in challenges to single-member as well as multi-member districts"). Plaintiffs' failure to establish any one of these three *Gingles* factors is fatal to their claim. *Id.,* —— U.S. at —— – ——, 113 S.Ct. at 1156–59. After meeting the threshold *Gingles* test, the plaintiffs must then prove that, under the totality of the circumstances, the challenged electoral system operates to deny minority voters an equal opportunity to elect representatives of their choice and to participate in the electoral process. *Id.* The defendants argue that the plaintiffs have failed to produce any evidence concerning the first and second *Gingles* factors.[7]

---

6. In support of their contention that findings in a preliminary-injunction setting are binding, the plaintiffs cite *Trans World Airlines, Inc. v. Morales,* 949 F.2d 141 (5th Cir.1991). There the court found, without mentioning *Camenisch,* that preliminary injunction findings were binding on the defendants under the doctrine of law of the case. However, there the defendants admitted that they were bound to the preliminary findings. *Id.* at 144. No such admission has been made here. Furthermore, *Trans World Airlines* cannot be considered controlling to the extent that it conflicts with clear Supreme Court precedent and prior Fifth Circuit law.

7. The state also asserts that it is entitled to summary judgment because the *Texas II* court in a section 5 proceeding found that another minority district could not be drawn beyond the number created in S.B.1. Therefore, the argument goes, the plaintiffs, who intervened in *Texas II,* are collaterally estopped from urging this Court in a section 2 proceeding that S.B.1 is illegal because another minority (or minority impact) district could be drawn.

We have described three necessary conditions for application of collateral estoppel: "(1) the issue at stake must be identical to the one involved in the prior litigation; (2) the determination of the issue in the prior litigation must have been a critical, necessary part of the judgment in that earlier action; and (3) the special circumstances must not exist which would render preclusion inappropriate or unfair." *Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.,* 951 F.2d 684, 691 (5th Cir.1992) (citations omitted). The plaintiffs argue that collateral estoppel is inappropriate here because section 5 provides that neither an administrative preclearance "nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement." 42 U.S.C. § 1973c. The Fifth Circuit has interpreted this language to mean "that private plaintiffs can challenge a plan even after § 5 clearance." *United States v. East Baton Rouge Parish Sch. Bd.,* 594 F.2d 56, 60 (5th Cir.1979). In a section 5 proceeding the defendant is the United States and it is assumed that the United States will adequately represent the

■ Looking to the plaintiffs' amended complaint filed on January 19, 1993, we find that the plaintiffs' sole example supporting their contention that S.B.1 dilutes minority voting power is the allegation that an additional minority impact district could have been created in Dallas and Tarrant counties.[8] During the fourth day of the evidentiary hearing held on December 13, 1991, the plaintiffs' expert stated that the *Quiroz* plan (now S.B.1) had nine minority districts and no impact districts. The plaintiffs' expert also stated that the plaintiffs' Fair Redistricting Plan had 9 minority districts, plus 1 minority impact district in Dallas and Tarrant counties that contained a combined minority majority of 54.1 percent of total population and 48.6 percent of voting age population. The plan analysis prepared by the plaintiffs shows that this district's total population figures were 22.6 percent black and 32 percent hispanic; its voting age population figures were 21.3 percent black and 27.6 percent hispanic.[9] The plaintiffs presented no evidence to show cohesion between black and hispanic voters either statewide or in the Dallas–Tarrant County minority impact district suggested by them in the December 1991 hearing or provided in this Court's

interests of minorities. *Donnell v. United States,* 682 F.2d 240, 247 (D.C.Cir.1982). Collateral estoppel will generally be appropriate against any party whose "legal interests were ... adequately represented by the public authorities." *Southwest Airlines Co. v. Texas Int'l Airlines,* 546 F.2d 84, 102 (5th Cir.1977). Therefore, given the presumption that the United States provides adequate representation, collateral estoppel would bar almost all private plaintiffs from relitigating in a section 2 proceeding an identical, central issue litigated in the prior section 5 proceeding. However, this result in substance conflicts with the Fifth Circuit's decision in *East Baton Rouge Parish, supra,* and with the language of section 5. Therefore we are presented with a special circumstance "which would render preclusion inappropriate." *Texas Pig Stands,* 951 F.2d at 691.

8. At the December 1991 evidentiary hearing, an expert witness for plaintiffs referred briefly in passing to the *Quiroz* plan as having put more Hispanics than necessary into its Hispanic majority senate district 27 in South Texas. It is doubtful that this theory is carried forward in the January 1993 amended complaint. The only allegations there as to minorities are contained in paragraph 17 (which alleges "an additional minority impact district could have been created in Dallas and Tarrant Counties"); paragraph 18 alleges discrimination against Republicans; and paragraph 19 alleges in its entirety:

"Senate Bill 1 fails to consider the growth patterns of the State of Texas, and has 'packed' certain areas with more persons than an optimum district should hold. These areas are growing at a rate far in excess of that of the State as a whole. This packing or overpopulating of certain areas will result in gross underrepresentation of the constituents in those areas."

Paragraph 19 cannot fairly be understood to allege adverse consequences to minorities by "packing" minorities into districts having an excessive majority of minority residents. There is no mention or even hint of "packing" elsewhere in the amended complaint. Nor do plaintiffs' responses to defendants' motions for summary judgment espouse such a theory.

Even if such a theory were alleged, there is no evidence to sustain it, because there is no evidence that any such "packing" impeded the creation of another minority district, or even a minority-influence district. *See Voinovich,* —— U.S. at ——, 113 S.Ct. at 1156–57 (leaving open the issue of whether influence dilution claims are cognizable under section 2). The Supreme Court has recently ruled that in regard to such a packing claim, the plaintiffs have the initial burden of proving that *as a result of such packing* "the State's apportionment scheme has the effect of diminishing or abridging the voting strength of the protected class." *Id.* —— U.S. at ——, 113 S.Ct. at 1151. The plaintiffs have failed to come forward with any summary judgment evidence to sustain a section 2 violation on this basis.

9. We also note that this Court's plan had a minority impact district in Dallas and Tarrant counties (district 12) with a combined minority total population of 54.1 percent and a combined minority voting age population of 48.5 percent. This district's total population figures were 22.6 percent black and 32 percent hispanic; its voting age population figures were 21.2 percent black and 27.6 percent hispanic. In the 1992 elections an anglo Democrat was elected from this district. Besides this minority impact district, our interim plan had at most nine minority districts—the exact same number of minority districts as S.B.1. However, the 1992 elections indicated that one of the court's interim plan minority districts was not necessarily a safe district for minorities. The court's district 15 in Harris County had an hispanic voting age population of 51.60 percent. In the Democratic primary run-off the hispanic candidate received almost all of the hispanic vote but failed to garner any substantial support from anglo or black voters. As a result, the anglo candidate defeated the hispanic candidate in the primary. The plaintiffs have failed to present any evidence on how the minority districts in their Fair Redistricting Plan would have fared under the 1992 elections.

plan.[10]

■ The Supreme Court has held that a district court may not assume the existence of minority bloc voting absent competent evidence. *Growe v. Emison,* —— U.S. ——, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993). In *Growe,* the district court rejected the state legislature's redistricting plans and adopted its own congressional and legislative plans that created super-majority minority districts by combining several distinct minority groups. The district court based such an agglomeration on a law review article that stated that bloc voting among minority groups is all but inevitable. The Supreme Court rejected this evidence as a sufficient basis for combining minority groups. The *Growe* court held that "[s]ince a court may not presume bloc voting within even a single minority group, it made no sense for the District Court to (in effect) indulge that presumption as to bloc voting within an agglomeration of distinct minority groups." *Id.* —— U.S. at ——, 113 S.Ct. at 1076 (citations omitted). In the case *sub judice,* there is no evidence of cohesiveness among distinct groups of minority voters in the relevant districts. The defendants, on the other hand, have presented substantial evidence that such cohesion does not exist among blacks and hispanics in Harris, Dallas, and Tarrant counties. Absent proof of cohesiveness, there is no substantial evidence that any material improvement, from the point of view of giving minority citizens an equal opportunity to participate in the relevant political process and to elect senators of their choice, could be made in S.B.1, and hence no evidence that it violates section 2.

Further, even if we were to assume the existence of relevant voting cohesion among minority groups, the ability to create no more than one extra minority impact district out of a total of thirty-one districts is insufficient to invalidate the state's apportionment plan. The state is not required to create the optimal minority redistricting plan. The Voting Rights Act itself states, "[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b) (West Supp.1992). The Fifth Circuit has held that the Act "is intended to discourage discrimination against minority groups with respect to their opportunity for *participation* in the electoral process, [but] it does not purport to guarantee or to compel minority representation in publicly elected bodies that is proportional to the racial makeup of the political unit." *Seastrunk,* 772 F.2d at 153. *Seastrunk* further states that "[t]he test is not for the superiority of an alternative plan, but whether the legislative choice passes muster. Thus, even the existence of the objectively superior Police Jury plan, standing alone, is insufficient as a basis to find that the Board plan was not constitutionally or legally permissible." *Id.* at 155. Another court has noted that "[i]t is doubtful whether *Gingles* held . . . that the amended Voting Rights Act § 2 requires that states go beyond the requirement of non-discrimination in order to create as many non-white majority districts as possible." *Watkins v. Mabus,* 771 F.Supp. 789, 806 (S.D.Miss.1991). The plaintiffs do not cite, and we cannot find, any case that invalidates a statewide legislative redistricting plan based on the absence of a minority impact district. To require such fine tuning would render the above cited language of the Voting Rights Act nugatory. This we decline to do.

Accordingly, we hold that defendants are entitled to summary judgment with respect to plaintiffs' claim that S.B.1 violates section 2 of the Voting Rights Act. In light of the above discussed evidence, and as there is nothing to indicate that S.B.1 was adopted with, or was the product of, any intent or purpose to discriminate against minorities, defendants are also entitled to summary

10. Similarly, intervenor Senator David Sibley (Sibley) presented his own plan, which had, according to the defendants' expert, an additional minority district when compared to S.B.1. However, Sibley has also wholly failed to present any evidence concerning relevant cohesiveness between hispanic and black voters. Such evidence is crucial in determining the viability of 2 of Sibley's minority districts where the minority vote is split: (1) district 12, with total population figures of 25.44 percent black and 41.41 percent hispanic; and (2) district 15, with total population figures of 44.97 percent black and 22.16 percent hispanic.

judgment on plaintiffs' claim that S.B.1 discriminates against or infringes the rights of minorities in violation of the United States Constitution.[11] *See Voinovich, supra.* For the reasons previously stated, defendants are entitled to summary judgment on plaintiffs' partisan gerrymandering challenge to S.B.1. Thus, defendants are entitled to summary judgment in respect to all of plaintiffs' challenges to S.B.1.

## IV. Congressional Action, CA–428

The defendants seek summary judgment on both the section 2 and partisan gerrymandering claims with respect to the congressional redistricting. As to the section 2 claim, the plaintiffs do not oppose summary judgment, and in fact admitted at the summary judgment hearing that their section 2 claim was "probably not provable at this point." We agree and grant summary judgment in favor of the defendants on the congressional section 2 claim.

 As to the partisan gerrymandering claim, the state asserts that it is entitled to summary judgment because the plaintiffs failed to make a *prima facie* case as required under *Davis v. Bandemer,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986). In order to establish a *prima facie* case of partisan vote dilution brought about by political gerrymandering in violation of the Equal Protection Clause of the Fourteenth Amendment, *Bandemer* requires plaintiffs "to prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group." *Id.* 478 U.S. at 127, 106 S.Ct. at 2808.[12] The intent element

is easily met, and for the purposes of this case we will assume that the plaintiffs' evidence is sufficient in this regard. *See Martin,* 980 F.2d at 955 (citation omitted) (observing that the *Bandemer* plurality "lowered the intent barrier essentially by presuming intent"). As to discriminatory effects, they cannot be based on "the mere fact that a particular apportionment scheme makes it more difficult for a particular group in a particular district to elect the representatives of its choice." *Bandemer,* 478 U.S. at 131, 106 S.Ct. at 2810. Instead, the plurality ruled that a discriminatory effect in political gerrymandering cases would be found only if a plaintiff political group proves disproportionality in conjunction with indicia that the group has "essentially been shut out of the political process." *Id.* 478 U.S. at 139, 106 S.Ct. at 2814. This means that as to discriminatory effect, the plaintiffs must make a two-prong showing: (1) of an actual or projected history of disproportionate results; and (2) that "the electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole." *Id.* 478 U.S. at 132, 106 S.Ct. at 2810; *see also Terrazas,* 789 F.Supp. at 833. For the purposes of this case, we will assume that the plaintiffs have made a sufficient showing of disproportionality respecting Texas congressional districts.

The defendants focus on the second prong of the discriminatory effect element and contend that it requires a showing that elected officials "will entirely ignore the interests" of the Republican Party. *Bandemer,* 478 U.S. at 132, 106 S.Ct. at 2810. The plaintiffs contend that this is not the standard, and

---

**11.** Plaintiffs merely make the conclusory allegation in their amended complaint that S.B.1 "has diluted the votes of minority voters in the State in violation of the United States Constitution and the Voting Rights Act." In none of their filings in support of their motion for summary judgment or in opposition to defendants' motions, nor in oral argument to this Court, have plaintiffs sought to support this constitutional claim.

**12.** *Bandemer* was decided by a fragmented Court and, although it held that partisan gerrymandering complaints were justiciable, no opinion setting forth the requirements for such a claim commanded a majority of the Court. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent

of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds....' " *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977) (quoting *Gregg v. Georgia,* 428 U.S. 153, 168, 96 S.Ct. 2909, 2923, 49 L.Ed.2d 859 (1976)). We believe that the plurality opinion provides the "narrowest grounds" so we apply it here. *See Republican Party of North Carolina v. Martin,* 980 F.2d 943, 955 n. 22 (4th Cir.1992); *Republican Party of Virginia v. Wilder,* 774 F.Supp. 400, 405 (W.D.Va.1991); *Badham v. March Fong Eu,* 694 F.Supp. 664, 668 (N.D.Cal. 1988).

that a partisan gerrymandering claim can be established without requiring such a high showing of a biased electoral system. The language relied on by the defendants was employed by the plurality to explain that in earlier cases involving particular multimember districts, the fact that representatives would "entirely ignore" a group could not be *presumed* by the mere showing that that group lost a disproportionate number of elections. *Id.* The plurality was not arguing that in those cases, or in *Bandemer* itself, the plaintiffs must show that their interests would, in actuality, be *wholly* ignored by the elected representatives. Indeed, if this were the standard, such a showing could likely never be made. We therefore reject the defendants' draconian interpretation of the second prong, which would in effect render the plurality's opinion nugatory.

Other courts have developed different interpretations of the proof required by the second prong based on different definitions of the term "political process as a whole." One court has adopted a very restrictive definition of this term such that it includes only the processes involved in the challenged political sphere. *Republican Party of North Carolina v. Martin,* 980 F.2d 943 at 956 n. 24 (4th Cir.1992). In *Martin,* the Republican Party had challenged North Carolina's method for electing superior court judges. By adopting the restrictive definition, the court analyzed only the processes concerned with electing superior court judges, and it did not review whether the Republican Party possessed some counterbalancing influence through another part of the judiciary or another branch of government. This rather narrow view fails to account for the interaction between different government structures. Certainly one structure, if viewed in the abstract, might appear biased against a particular partisan group. However, if the political structures are taken as a *whole,* such bias may disappear. *See Fund for Accurate & Informed Representation v. Weprin,* 796 F.Supp. 662, 669 (N.D.N.Y.1992) (noting that although the Republicans were a minority in the state's assembly, they were a majority in the state's senate, and "[i]t may not sensibly be denied that a political party controlling the Senate is able to influence legislation"

because "no legislation becomes law without the approval of the senate").

Some courts, on the other hand, employ a very expansive definition of the term "political process as a whole," such that it encompasses not only governmental structures but also the functioning of the partisan group. These courts require a showing that the group has been "shut out" of the political process by demonstrating that someone has interfered with the group's "registration, organizing, voting, fund-raising, or campaigning," or that there exist impediments to the group's "full participation in the 'uninhibited, robust, and wide-open' public debate on which our political system relies." *Badham v. March Fong Eu,* 694 F.Supp. 664 at 670 (N.D.Cal.1988) (citation omitted); *see also Republican Party of Virginia v. Wilder,* 774 F.Supp. 400 at 405–06 (W.D.Va.1991). This standard is derived from *Bandemer*'s discussion of *racial* gerrymandering cases where a racial group alleged that it was excluded from the processes of a political party. The *Bandemer* court distinguished these racial cases from partisan gerrymandering cases because "it could hardly be said that Democrats, any more than Republicans, are excluded from participating in the affairs of their own party." *Id.* 478 U.S. at 137, 106 S.Ct. at 2813. However, it serves no useful purpose to graft the requirements for that sort of racial gerrymandering case onto partisan gerrymandering cases because the concern in the latter, unlike the former, is not whether a particular group may participate in a political party but whether the political party as a whole may participate in the governing of the state's affairs. In a partisan gerrymandering case there will rarely, if ever, be a showing of outside interference in "registration, organizing, voting, fund-raising, or campaigning," because the dominant partisan group need not and likely would not dilute another group's influence in this manner. *See Martin,* 980 F.2d at 958 (rejecting this expansive definition because no partisan group could ever make this showing). Instead, the dominant group typically uses the structural features of the state's political system—which it controls—to perpetuate its own power at the expense of other partisan

groups. Gerrymandering is concerned with dilution of political influence through the manipulation of elective district boundaries, not with other abuses of the electoral process or First Amendment violations.

We think the true focus of the second prong of *Bandemer*'s effects test should be on analyzing the perpetuation of power within the structures of the state's political system. Therefore, the term "political process as a whole" means straightforwardly all the structures of the state governmental system, but not the internal structures of the partisan group. *Weprin, supra.*[13] Under this framework, a partisan group will have satisfied the second prong of the discriminatory effect requirement under *Bandemer* if it presents evidence of a group perpetuating its power through gerrymandering in one political structure and that the wronged partisan group cannot over the long haul counteract this tactic through its influence in another relevant political structure or structures.

As to the case *sub judice*, the plaintiffs seem to view the congressional delegation as another state political structure and argue that because they lack influence in regard to other state structures, they were denied influence in selecting the apportionment plan for the congressional delegation.[14] Assuming that this claim may be analyzed in reference to the state political structures, the plaintiffs fail to make a showing that they lack influence in the state political process as a whole. The plaintiffs contend that they carry half or more of the state in statewide baseline elections but they have never had a majority in either house of the state legislature and no Republican has been Speaker of the House or Lieutenant Governor, the presiding officers of the House of Representatives and the Senate, respectively. Assuming that these contentions are true, the plaintiffs have not shown that they cannot block a Democrat-backed redistricting plan and thereby have no influence in crafting such a plan. The office of governor, of course, is elected statewide and is hence not subject to gerrymandering (and this is also true of the office of lieutenant governor). In the past fifteen years, the Republicans have twice been successful in electing a Republican governor who could exercise veto power over legislation including any apportionment plan.[15] Such a veto can be overturned only by a two-thirds majority in both houses. TEX. CONST. art. IV, § 14. In the Texas House of Representatives, the Republicans control approximately forty percent of the seats, giving them the ability to sustain a Republican governor's veto.[16] The plaintiffs argue, however, that if the legislature fails to draw up a redistricting plan, then a plan is

**13.** Nor do we focus on the rights of individuals to speak or register or vote, as distinguished from the possible effects on government structures of their doing so. Gerrymandering, as such, does not imply that the thus disfavored are not allowed to speak or vote; only that the effects of their doing so are improperly diluted by the manipulation of the boundaries of elective districts.

**14.** We note that the plaintiffs are not challenging the composition of a state legislative body but rather the composition of the state's congressional delegation that serves as part of a national political body—the United States House of Representatives. This factor distinguishes the plaintiffs' challenge from other partisan gerrymandering cases. *See Bandemer, supra* (concerning the state's senate and house); *Martin, supra* (concerning the state's superior court judges); *Weprin, supra* (concerning the state's senate and assembly); *Illinois Legislative Redistricting Comm'n v. LaPaille,* 782 F.Supp. 1272 (N.D.Ill. 1992) (concerning the state's senate and house); *but see Badham, supra* (concerning the state's

congressional apportionment scheme but reviewing it to determine only if there had been outside interference in the Republican Party's internal operations). Certainly, the plaintiffs cannot contend that the Republican Party lacks influence in the national political process as a whole.

**15.** As further indicia of the Republican Party's influence in the state legislature we note that currently a Republican chairs the House's Redistricting Committee. Moreover, Republicans chair the Senate's Education, Jurisprudence and State Affairs Committees; and the House's Business and Industry, County Affairs, Higher Education, Human Services, Insurance, International and Cultural Relations, Investments and Banking, Urban Affairs, and Ways and Means Committees.

**16.** Moreover, there is no showing that the Texas House of Representatives is so gerrymandered that the Republicans for that reason have no chance of electing a fraction of the membership equivalent to the fraction of voters statewide who are Republicans.

created by the Legislative Redistricting Board, which has always been composed of Democrats. Although the Board does, in certain instances, create state plans for the House and Senate, four of its five members are elected statewide [17] and, in any event, it does not draw up apportionment plans for the state's congressional delegation. TEX. CONST. art. III, § 28. The plaintiffs' evidence fails to show that "they will be unable to effectively influence legislative outcomes." *Illinois Legislative Redistricting Comm'n v. LaPaille*, 782 F.Supp. 1272 at 1276 (N.D.Ill. 1992).

Accordingly, we grant the defendants' summary judgment motion as to the plaintiffs' congressional partisan gerrymandering claim.

### Conclusion

For the reasons above stated:

We grant defendants' motions to dismiss No. A–91–CA–425, concerning the Texas House of Representatives, as moot, and order that said cause be dismissed without prejudice as moot.

In No. A–91–CA–426, concerning the Texas Senate, we deny plaintiffs' motion for summary judgment and we grant defendants' motions for summary judgment, and order that said cause be dismissed with prejudice.

In No. A–91–CA–428, concerning the Texas congressional districts, we grant defendants' motions for summary judgment, and order that said cause be dismissed with prejudice.

The dismissals of cause No. A–91–CA–425 and cause No. A–91–CA–426 shall be without prejudice to whatever rights, if any, plaintiffs may have to attorney's fees (and related costs) on account of or in relation to any relief heretofore awarded in said causes or either of them.

WALTER S. SMITH, Jr., District Judge, dissenting in part.

I join in the majority as to the dismissal of the house action as moot, as to the granting of Defendants' motions for summary judg-ment on Plaintiffs' claims of partisan gerrymandering of the Texas senate, as to the granting of Defendants' motion for summary judgment on Plaintiffs' congressional section 2 and partisan gerrymandering claims.

I cannot, however, concur in the granting of Defendants' motion for summary judgment as to the section 2 senate claims.

The linchpin of the majority's opinion is that the finding made in two previous opinions of this Court, that the redistricting plan continuously espoused by the Defendants violated the Section 2 requirements of the Voting Rights Act, was superfluous. Apparently one of the majority's memory differs from mine; and the other member of the majority can have no memory of that determination, not having been a member of this Court at that time.

The majority faults our former opinions for not including sufficient factual details. I disagree with that position, but in any event, that is not a sound reason to ignore a previous determination.

This Court has consistently and repeatedly held that the senatorial election plan now known as S.B.1 is violative of the Voting Rights Act. The Supreme Court has declined to overturn that finding on several occasions. Nothing presented as summary judgment proof has convinced me that our previous determinations were incorrect.

I would grant Plaintiffs' motion for summary judgment as to the senate section 2 claim.

---

**17.** In addition to the office of governor, the Republicans have in recent years also been success-ful in several other statewide elections, both for state and national offices.